(88 South. 808)

No. 22687.

## STANDARD OIL CO. OF LOUISIANA v. WEBB.

(May 2, 1921. Rehearing Denied May 30, 1921.)

*(Syllabus by the Court.)*

1. Records ⊚⇒6—Law requiring contracts concerning immovable property to be recorded does not specify language of contract.

The law which requires that all contracts concerning immovable property shall be recorded in order to affect third persons contains no specification of the language in which such contracts shall be framed, and all substantial rights which they purport to secure are protected by such recording.

2. Mines and minerals ⊚⇒73—Interest remaining after execution of oil and gas lease containing absolute sale of oil and gas stated.

Where the owner of land has incumbered it with a valid oil and gas lease, containing what is declared to be an absolute sale of the underlying oil and gas, he has nothing left to sell, so far as those minerals are concerned, save an interest contingent upon the failure of his lessee to exercise his rights and comply with his obligations; and one who buys the land, with actual as well as presumptive knowledge of such recorded lease, acquires no greater interest by his purchase, and can convey no more to one to whom he assumes to lease the land for oil and gas development.

3. Mines and minerals ⊚⇒73½—Interruption from lessor's attempt to have oil and gas lease declared invalid extends term of lease.

Where the lessor, in an oil and gas lease, brings suit to have it decreed void, and thereby interrupts the term during which the lessee would otherwise be able to operate, and his suit is eventually, and after the expiration of such term, dismissed, the interruption cannot be charged to the lessee, to whom a reasonable time, beyond the original term, is thereby allowed; and one who has bought the land pending the litigation, and with knowledge thereof, and of the recorded lease, is charged with knowledge of such right; and where, under such circumstance, he assumes to grant a lease, selling the oil and gas, to a third person who has no knowledge either of the existing lease or the litigation concerning it for a price paid and payable partly in cash, he may be condemned to reimburse the money so paid.

Dawkins, J., dissenting.

Appeal from First Judicial District Court, Parish of Caddo; R. D. Webb, Judge.

Action by the Standard Oil Company of Louisiana against F. F. Webb. Judgment for plaintiff, and defendant appeals. Affirmed.

W. P. Hall, of Shreveport, for appellant.

J. C. Pugh & Son, of Shreveport, and Arthur A. Moreno, of New Orleans, for appellee.

Statement of the Case.

MONROE, C. J.  This case is before the court on appeal, by defendant, from a judgment condemning him to pay plaintiff $2,700 with interest and costs.

The facts disclosed by the record are as follows:

On February 24, 1909, Albert Leonard, by one contract, and the Huron Land Company and Clarence Ellerbie, by another contract, in the one instance, for $680 cash and further considerations, and in the other, for $1,306.80 cash and further considerations, granted, bargained, sold, and conveyed to the Busch-Everett Company all of the oil and gas, in and under certain tracts of land in Caddo parish aggregating over 7,000 acres, together with rights of ingress and egress, upon and from the land, all subject to and upon other terms and conditions usual in such contracts, including the condition that the grant should be forfeited unless the grantee should drill a well for gas or oil within a year; provided that it might prevent such forfeiture, and keep the contract alive, during five additional years, by making quarterly payments, in the one case, of $170, and, in the other, of $326.-50.  It was agreed that, in the event of the discovery of oil or gas, the grantor should receive one-eighth of the oil saved on the premises, and a certain amount for each gas well and free use of gas for certain purposes if both oil and gas should be discovered, saved, and used, etc.

"This grant" (the contract reads) "is not intended as a mere franchise, but it is intended as a conveyance of the property above described, for the purposes herein mentioned, and it is so understood by both parties to the agreement."

The grantee, having drilled no well within the year, availed itself of the right agreed on, to extend the term of the contract by making the quarterly payments, as therein provided, which it continued to make up to, and inclusive of, the quarter beginning on May 24 (or 25th) 1913, or a total of say, $1,-985, after which they were discontinued by reason of the fact that Leonard (who appears to have succeeded to the rights of his co-grantor) refused to receive them, on the ground that the conditions of the contracts were potestative and neither party was bound by them; and thereupon, on August 26 and 29, respectively, the grantors instituted suits in the district court to have the nullity, thus alleged, decreed.  In the meantime, on December 9, 1912, while the quarterly payments were being received, without objection, Leonard sold the land here in controversy—which was included in the contract with the Busch-Everett Company—to the defendant herein, by an act in which the recited consideration is $29,400, of which $5,000 is said to have been paid in cash and the balance by notes, secured by mortgage, and in which, also, not only was the mortgage certificate waived, but, also the production of the tax receipts in default whereof notaries are prohibited from executing such instruments."

In the meantime, also (that is to say, on August 27, 1913), the Busch-Everett Company had transferred the contracts in question, with others, to the Passadena Petroleum Company, by which they are said to have been subsequently transferred to the Producer's Oil Company.  Thereafter, on March 13, 1915, while the suits so instituted by the grantors of the Busch-Everett Company were pending in the district court, the defendant entered into a contract with plaintiff with respect to the property here in question (being what is called an oil and mineral lease, in about same form as that between his author in title and the Busch-Everett Company) for the consideration of $1,800, paid in cash, and the other considerations usual in such cases, and with a similar condition in regard to the rights of the grantee to prevent forfeiture by making quarterly

payments, and he received two such payments, of $450 each, making the total received by him the $2,700 for the reimbursement of which this suit is brought. Defendant was aware at that time of the existing lease to the Busch-Everett Company, which was recorded in the proper office, and of the pending litigation concerning it; but he did not impart that information to plaintiff, and plaintiff did not obtain it until afterwards; the explanation of its ignorance of those matters being found in the testimony of the late Judge J. C. Pugh, who, having been the only person, save the defendant, who was familiar with the circumstances leading to that contract, withdrew from the case, as plaintiff's counsel, and gave his testimony, to the following effect: He met defendant on March 13, 1915, and learned from him that he was trying to lease his property but had been unable to do so. He informed him that plaintiff had some leases in that neighborhood and that he believed plaintiff could handle it, and he took defendant to plaintiff's office, in Shreveport, and introduced him to Mr. Baird, "the lease man," whom he told that defendant had land to lease (for oil and gas purposes), at $3 an acre. Baird agreed to take the lease at that price, and asked witness whether he was going to examine the title, to which witness replied that he had known Mr. Webb for many years, and that "they" (meaning the plaintiff company) "could rely on anything that he said." Baird then asked defendant if there was anything against the property, and he replied, substantially, that "Mr. Leonard had a mortgage," and witness then stated that the mortgage could be arranged, either by Mr. Leonard subordinating, or signing an agreement not to foreclose, it within a specified time; and that such an arrangement was made (Mr. Leonard's written agreement not to foreclose within three years being in evidence); and that the contract was thereupon entered into. Witness

further testifies that Mr. Clark, plaintiff's general manager, was not consulted, and that he afterwards told witness that he had received information to the effect that the property leased was embraced within what was known as the "Busch-Everett lease," and suggested that witness inquire into it; and that witness learned, upon inquiring from the title man of the Producers' Oil Company, that the description in its lease was vague and that he had ordered an abstract of the title and would later advise witness whether it covered the property leased by defendant to plaintiff; that considerable delay ensued, and that, finally, witness undertook an independent investigation, but that, a year having elapsed, plaintiff began making the quarterly payments required to prevent forfeiture; that the abstract company reported to plaintiff on September 4, 1916 (the report being in evidence and showing that defendant's lease to plaintiff included the land which had been leased to the Busch-Everett Company); that witness advised that it would be necessary to drill a well on the property, but that plaintiff was notified by the Producers' Oil Company that it would hold plaintiff liable in damages if such drilling were prosecuted; and that witness was satisfied, from personal examination, that the land covered by plaintiff's lease from defendants was included in the Busch-Everett lease.

That, in the meantime, the suits brought by Leonard and Ellerbie were pending in the Supreme Court on rehearing (should be an application for rehearing); there having been judgments for defendant in the trial courts which had been affirmed, by the Supreme Court (and, it may be added, the rehearing was refused by this court on October 6, 1916); that being the situation, witness suggested to Mr. Webb that if he would agree to return the money, in the event of the denial of the rehearing, plaintiff would continue to make the quarterly payments, leav-

ing the question of the return of the money previously paid to be determined in a friendly suit, to which suggestion Webb replied that he would consult Mr. Leonard, and that, a few days later, witness received a letter, signed by Webb but in the handwriting of Leonard, in which Webb denied that he was under obligation to return any money received by him. Witness further testifies that, in a number of interviews that he had with him, Webb asserted that there was no lease on the property in question and that he had a letter from Leonard to that effect; and that he (witness) was satisfied that Webb was acting in good faith, and did not really know, when he made the lease to plaintiff, that the property was under lease to the Busch-Everett people.

Defendant testifies that Leonard and Ellerbie informed him that the term of the Busch-Everett lease had expired and that the land was free to be leased by him. His cross-examination runs, in part, as follows:

"Did you tell them (Standard Oil people, when negotiating the lease) that Mr. Leonard had a mortgage on the property? A. They put me off that evening—to examine records. They said they would examine the records. Q. Did you tell them that Mr. Leonard had a mortgage on the property. A. I could not say that I did or did not, at that time; if they had asked me the direct question, I would have told them, Yes. * * * Q. You did not know anything about the suit on this particular piece of land? (Objection. Overruled.) A. Yes, I heard there was a suit filed, but Mr. Leonard informed me that it was over with and the land was now free to be leased. He being a lawyer, I thought it right. * * * Q. You did not state to the Standard, at that time—you did not mention anything about the suit? A. No, sir; I thought they all knew it. The oil companies have maps, and all those maps show the Sand Beach Plantation, and where the Busch-Everett lease was. Other companies were leasing land this same way. Other people leased some of this land, the same way."

### Opinion.

It will be seen from the foregoing statement that the six-year terms of the Busch-Everett leases which were to have been secured to the lessee (during five of the years) by the quarterly payments would, ordinarily, and in the event of failure to discover oil or gas have expired on, say, February 24 (or 25), 1915, but that the lessors, in August, 1913, interrupted the payments by refusing to receive them and by suing to have the leases decreed null for potestative conditions and want of mutuality; and that the litigation so inaugurated remained pending until October, 1916, when this court refused to grant a rehearing, thereby making final the judgments handed down in June, whereby plaintiffs' demands were rejected and their suits dismissed, with a reservation of their right to require the sinking of wells on the leased premises, as stipulated in the contract, within a reasonable time.

Defendant's position is that his rights are to be determined as of the date of his acquisition of the property, considered with reference to the incumbrances with which it was burdened, at that time, to wit, December 9, 1915; that under the Busch-Everett leases, which then incumbered it, that company was entitled to hold the property, for oil and gas operations, at most, for six years from the date of its leases, or, say, until February 24 (or 25), 1915, after which it was competent for him as owner of the land and minerals to disregard these leases, as though they had never been recorded; and that from December 9, 1912, it was incompetent for Leonard, his vendor, by any act of his, whether for or against the Busch-Everett Company, to increase the burden imposed by its leases, upon that date.

[2] The weakness of the position thus stated lies in the omission of certain elements needed for its foundation. It is beyond dispute that, by a contract, executed and recorded nearly four years prior to defendant's acquisition of the property in question, Leonard had granted, sold and conveyed all the

oil and gas therein and thereunder to the Busch-Everett Company, and had received part of the price in cash and part in quarterly installments from the date of the contract, and had continued to receive them after the purported sale of the same property to defendant (which is remarkable, considering that he had made the sale to defendant). So far, therefore, as those minerals were concerned (and we are here concerned with nothing else), he had nothing to sell to defendant, save an interest, contingent upon the failure of the parties to the earlier contract to comply with their respective obligations, and the contract spoke from the record to that effect. So that, when defendant says that Leonard could not, after his (defendant's) acquisition of the property, prejudice his rights by bringing suit to annul the contract with the Busch-Everett Company, he uses a sword which cuts both ways, since the argument also means that, after the Busch-Everett Company had acquired the rights conferred on it, by its prior contract, Leonard had no power to prejudice these rights by selling them to defendant. The most that he could do was to sell the land subject to the incumbrances, such as they were, with which it was then burdened; and the land, with its then incumbrances, was all that defendant acquired, or could acquire. If, for instance, upon the last day of the six years during which the Busch-Everett Company had the recorded right to explore for oil and gas, these minerals had been discovered in such quantities that they could be profitably produced for a century, the discoverer, or its assigns, would have been entitled to produce them for a century.

[1, 3] Having conveyed the minerals in question, with the right of ingress and egress upon and from the land, to the Busch-Everett Company, Leonard had no standing to interfere with his grantee in the enjoyment of the rights so conveyed, unless for some default on its part or illegality in the contract. He made that experiment, but it failed; and, as his contract was recorded, his successor in title is in no better position; since he, as well as Leonard, is as much bound by one of the stipulations of the recorded contract as by another. The law requiring rights asserted against immovable property to be made of record, in order that they may affect third persons, contains no specification of the language in which such record shall be framed; and the notice so required, for the benefit of third persons, is sufficient if such persons are thereby reasonably informed of the nature and substance, or the amount in money, of the right. If, then, in this instance, the Busch-Everett contract sufficiently informed defendant that, in the event of the discovery, during its term, and by that company or its assigns, of oil and gas, the right of the discoverer to operate under the contract for an indefinite period would be secured; equally did that contract sufficiently inform him that the Busch-Everett Company and its assigns were entitled to ingress and egress to and from the property for all the purposes of the contract, and for the term, and extended term, as therein provided, without hindrance or interruption from the grantor; and hence, as Leonard, if before the court, could not be heard to assert that the interruption, caused by his act, should be included in the term of the contract, as time to be charged to his grantee, neither can the defendant, claiming under him, and informed, in the manner required by law, of his obligation in the premises, be so heard.

It may be here remarked that, so far as we can see, the suits to annul the lease of the land here in question could have inured to the benefit of no one else but the defendant, since, according to the record, he had bought the land outright and his title purports to include all that is above or below the surface and leaves no interest whatever in his

vendor. It could not, however, include the recorded rights already vested in a third person, which he assumed to sell to the plaintiff herein, and for which he received payments; and, as plaintiff took nothing by those payments, the money so paid should be reimbursed by defendant, as herein prayed.

The judgment appealed from, which was in favor of plaintiff, is therefore affirmed.

DAWKINS, J. (dissenting). February 24, 1909, A. H. Leonard and wife, and Clarence Ellerbie, being the owners of certain lands in the parish of Caddo consisting of some 5,000 acres, gave to the Busch-Everett Company a mineral lease thereon, which under the decision of this court in the case of Chadwick v. Standard Oil Co. (No. 22667) 147 La. 668, 85 South. 633, permitted the lessee, for a period of six years, to explore for oil and gas upon the payment of a certain yearly rental. On its face, therefore, the said lease was to expire on February 24, 1915, if the lessee failed, within that time, to exercise the privileges conveyed.

On December 9, 1912, the said lessors sold to the defendant F. F. Webb some 580 acres of this same tract of land known as the "Sandy Beach" plantation, for the sum of $29,400. No reference whatever to the former mineral lease to the Busch-Everett Company was made in the sale to Webb.

On August 26 and 29, 1913, Leonard filed suits against the Busch-Everett Company to annul the mineral lease given prior to the sale to Webb, upon certain grounds, which terminated adversely to Leonard. When that litigation became final in this court on October 16, 1916, the lease, on its face, had expired by a period of nearly 20 months; but, in view of the fact that Leonard had, by his suit to annul, put himself in default on his obligations as lessor, we held that he could not be heard to assert such expiration, and decreed that the lessee should have a reasonable time after the finality of our judgment in which to exercise its rights.

March 13, 1915, more than six years after the giving of the lease by Leonard and others (February 24, 1909), and while the suit of Leonard v. Busch-Everett Co., 139 La. 1099, 72 South. 749, was pending in this court, Webb gave to the plaintiff in the present case, Standard Oil Company of Louisiana, a mineral lease upon that portion of the land which he had acquired from Leonard and others on December 9, 1912, and for which he was paid $1,800 cash, and was to receive thereafter rentals at the rate of $450 per year, for five years or until drilling actually commenced. The Standard Oil Company thereafter made two of these annual payments to Webb, amounting to $900, and making a total of $2,700.

Plaintiff brings this suit to recover from Webb the sum paid as above outlined, upon the theory that the lease from Leonard to the Busch-Everett Company, given on March 13, 1915, was still in force when plaintiff's lease was given and for this reason the lessee in the latter instance acquired nothing for the money so paid.

There was judgment for plaintiff in the court below for the full amount, and defendant appeals.

The sole question in the case is as to whether or not Webb, who purchased a part of the land from Leonard after the lease to the Busch-Everett Company (hereinafter referred to as the Busch-Everett lease) was given, was bound or his said land affected by the extension of time beyond the stipulated term, allowed defendant within which to explore for oil and gas by the decree of this court in the case of Leonard v. Busch-Everett Company.

I find that both in the brief of counsel for plaintiff and in the opinion of the lower court, it is stated that the sale by Leonard to Webb was made after the suit of Leonard v. Busch-Everett Company was filed in the

district court, and the reasoning of the lower court proceeds largely upon that theory. However, an examination of the record discloses, as set out in the above statement of the facts, that Webb purchased the land on December 9, 1912, and the suits of Leonard were not filed until August 26 and 29, 1913.

Therefore, when Webb bought, he acquired subject only to such rights of the Busch-Everett Company as were disclosed by the conveyance records. He was informed by those records that the Busch-Everett Company held a mineral lease upon his land which would expire on February 24, 1915, unless the said lessee or its assigns commenced operations before that time. To that extent, nothing that he might have done could have freed his property from the charge thus imposed. But when Leonard sold to Webb, he divested himself of all interest in the property (the privilege of exploring for minerals, for the period stipulated in the Busch-Everett lease, having already been conveyed to that company), and was therefore powerless to impose any further obligations upon either the possessor of the mineral rights or the owner of the land. However, the law made him the warrantor both of his lessee and his vendee, in that he was bound to protect them in the enjoyment of the interest which he conveyed to each. The rights of each were measured by the contracts under which they acquired. If he had continued to own the land, as a consequence, equity would have compelled him to allow his lessee to exercise its rights under the lease for the period during which his own acts had prevented it from doing so; and in my opinion it requires no citation of authority to sustain this elemental principle of justice. But inasmuch as he was no longer the owner of the land now involved either when that litigation commenced or when it terminated, he could not voluntarily or by indirection tax it with any further obligations without the consent of his vendee,

149 LA.—9

Webb, nor could this court add any further burdens than those which rested upon the property when Webb acquired it. Under his warranty Leonard became liable in damages to the Busch-Everett Company for his failure to maintain it in peaceable possession under the lease just as in any other case involving the breach of contract. When the case of Busch-Everett Co. v. Leonard was finally decided by this court, it was not known to us that the defendant in that case had already disposed of the land in the manner above outlined, and Webb not being a party thereto, of course, was not bound by the judgment.

Like the trial court, I deem it unnecessary to decide what effect the failure to file notice of lis pendens, under the Act No. 22 of 1904, might have been, but my reason is that the suit of Leonard had not been instituted when Webb bought, and, of course, if he was not affected by that subsequent litigation, certainly the plaintiff, Standard Oil Company, his lessee, was not.

In the original brief filed herein plaintiff's counsel cites well-recognized principles of law to the effect that a lessor is bound to maintain the lessee in the enjoyment of the thing leased, and that when one has shown a valid outstanding title in another, he does not have to prove actual eviction in order to recover back the purchase price. But in the oral argument and in a supplemental brief, it is contended that Webb was bound by the estoppel which prevented Leonard from asserting that the Busch-Everett lease had expired. It was also urged in the oral argument that when Webb acquired from Leonard, he did so subject to the eventuality that Leonard might default in his obligations of warranty, and when that condition happened, he (Webb) was bound to abide the consequences which followed, that is, the prolongation of the lease in favor of the Busch-Everett Company, on the theory that a purchaser can acquire no greater rights than those

possessed by his vendor. The following authorities are cited in support of these contentions: Barfield v. Hewlett, 4 La. 118; Linton v. Guillotte, 10 Rob. 357; McAuley v. Creditors, 4 La. Ann. 52; Leftwich v. Brown, 4 La. Ann. 104; Walker v. Municipality No. 1, 5 La. Ann, 10; Moore v. Lambeth, 5 La. Ann. 66; Girault v. Zuntz, 15 La. Ann. 684; Pipkin v. Sheriff, 36 La. Ann. 783; Sikes v. Basnight, 19 N. C. 157; Conkling v. Sesor Sewing Machine Co., 55 How. Prac. (N. Y.) 269; McCravey v. Remson, 19 Ala. 430, 54 Am. Dec. 194; Kennedy v. Brown, 61 Ala. 269; Hasenritter v. Kirchhoffer, 79 Mo. 239.

In the case of Barfield v. Hewlett, the plaintiff brought suit to recover two slaves in the possession of defendant. Defendant claimed to have acquired the slaves at auction from one Harraldson. Harraldson had brought them to Louisiana under a written agreement with plaintiff that he should hire them out for plaintiff until the arrival of the latter at Opelousas, but, instead, they were brought to New Orleans and sold at auction by Harraldson. It was merely held that, in these circumstances, the defendant had acquired no title. I see no analogy to the present case.

The case of Linton v. Guillotte was one in which the plaintiff sought to enjoin defendant, from whom she had acquired certain lots supposed to front on an extension of Camp Street in the city of New Orleans, from selling or obstructing the space claimed to be a street, as private property. It was found that the supposed street had never been opened or used, that a part of it was occupied by defendant's house, and while he had agreed that the space might be opened as a street, it was on the condition that he should be paid $5,000 for the property, which was never done. The court found that there had been no dedication to public use, and that when the plaintiff purchased, she did so with full knowledge of the true conditions, and could acquire no greater rights than her vendor enjoyed. Again, I see no analogy to the present case.

In the case of McAuley v. His Creditors, the appellants had purchased two notes of an insolvent from the commissioners of the Exchange & Banking Company, which were secured by mortgage on certain slaves. Before plaintiff acquired the notes the slaves had been sold by the syndic and bought in by the bank and a part of the proceeds retained by it to be credited on the notes. The surplus had been paid over by the bank to the syndic and apportioned on his account for the payment of other debts of the insolvent, all of which action had been approved and the account homologated by the court. It was held that in these circumstances, plaintiff, who acquired thereafter, had no greater rights than the bank. (It does not appear whether the notes had matured on their face or not, but in law, the failure of the maker made them become due immediately, and plaintiff knew when he purchased them that he was getting notes owed by an insolvent estate.) I do not think this case throws any light upon the present one.

Leftwich v. Brown was a case in which the plaintiff had purchased the right of action of a minor against his tutor for an accounting, and all that was decided was that, in these circumstances, the tutor was entitled to credit for payments made to the minor after he had become of age; and that these might be shown to offset the claims of the former minor in the action by the purchaser of that litigation, the court saying, I think correctly, that the plaintiff had acquired no greater rights than the minor could have asserted.

In Walker v. Municipality No. 1, it was held that a purchaser of notes, after maturity, from a bank which, under a statute of the state then in force, when in liquidation

was required to accept its own notes in payment of debts due it, took the notes subject to the same requirement, and could be compelled to accept the depreciated notes or currency of the bank in payment.

Moore v. Lambeth was very similar to Barfield v. Hewlett, except that the agent of the plaintiff had, on bringing the slaves to Louisiana, mortgaged them, and the defendant was the purchaser at execution sale. It was held that he acquired no title because plaintiff had intrusted the slaves to the agent for farming purposes, and with no power to mortgage.

In Girault v. Zuntz, plaintiff sought also to recover a slave, and defendant attached his title under the following circumstances: Plaintiff had bought the slave in under execution of a judgment in her favor against her husband. Later the husband, without her knowledge, received from one Kendall the sum of $300, and at the time Kendall executed the following writing:

"Tallahatchie Co., Miss., Oct. 23, 1846.
"I, Wm. G. Kendall, have this day advanced to Mrs. Susan Girault the sum of $300.00, upon a certain negro boy named Joe, five years old, and black complexion, and the son of Old Billy, formerly belonging to James A. Girault, which said sum of money, if returned at any time, with ten per cent., within five years, the said boy is to be delivered to the said Mrs. Susan Girault, or her agent. I also bind myself to clothe, feed and pay all doctor's bills for said boy; also be responsible for the said delivery, to the said Mrs. Girault, of said Boy.
　　"[Signed]　W. G. Kendall."

Defendant Zuntz acquired from Kendall. Zuntz attempted to show that the proceedings by which plaintiff acquired from her husband were fraudulent, and that the slave belonged to the latter. It was held that Kendall had recognized plaintiff's title in the document just quoted more than three years after the execution sale, and hence that he (Kendall) could not dispute it; and that his vendee, Zuntz, was likewise bound by this estoppel.

The difference between that case and the present one is that all of the acts done by the defendant's vendor had been before the defendant purchased, and their full legal effect had attached to the property which was transmitted to him subject thereto; whereas, in the instant case, the violation of the warranty in the Busch-Everett lease by Leonard occurred after he had sold the land to Webb, and at a time when he no longer had any right to impose a charge against it or to make admissions to affect the title other than those which were disclosed by the conveyance records and upon the faith of which Webb was entitled to rely.

In Pipkin v. Sheriff, a creditor of a husband had seized certain of the latter's property, which seizure he enjoined, and while this proceeding was pending, a dation en paiement was made to the wife of the same property. Subsequently the injunction was dissolved and the creditor proceeded with the sale. He was then enjoined by the wife who claimed the property. Plaintiff contended that there had been no actual seizure, and hence her title was not affected by the creditor's suit. It was found that, under the circumstances of that case, there had been a valid seizure, and that plaintiff was estopped by the judicial admissions of her husband (from whom she afterwards acquired) in his injunction suit that the property had been seized. I can see no application to the present case, for here there was not only no seizure of the property when Webb purchased or at any other time, but in fact the suit was not filed for more than eight months afterwards.

Sikes v. Basnight was an action in trespass, and the plaintiff introduced, first, a deed to the land from one Sawyer to himself, and, second, one from the same author to defendant, but of date later than that of plaintiff. Thereupon defendant sought to prove title in a third person hostile to the

one which had come from Sawyer, the common author of plaintiff and defendant. It was held that, since Sawyer would have been estopped from making such showing, his vendee, the defendant, whose deed from Sawyer was anterior to that of plaintiff, was likewise estopped from showing title from any one other than Sawyer. This is in line with the uniform jurisprudence of this court; that is, that persons who claim from a common author cannot be heard to dispute that author's title. La. Dig. vol. 5, p. 927, § 22, Estoppel; Watson v. Succession of Barber, 105 La. 460, 29 South. 949; Agurs v. Hunsicker (No. 22780) 147 La. 939, 86 South. 401. But the defendant in the present case is not disputing Leonard's title. On the contrary, he admits that when the Busch-Everett lease was given, Leonard owned the land; but asserts that by the limitations of the very title of which that company acquired, as disclosed by the conveyance records, its rights had expired when the lease to plaintiff was given. Plaintiff would apply this well-recognized principle, not to the record and the interest conveyed thereby, but to subsequent conduct of Leonard, dehors the record, where he, as an independent agent, had violated the warranty imposed by the lease, and to the defendant who had acquired the land before such conduct, for the purpose of preventing defendant from reaping the benefits of the implied reversionary clause in the lease with reference to the mineral rights, which freed it from that obligation when the lease by its own terms expired.

I think it sufficient merely to quote the syllabus of Kennedy v. Brown to show its inapplication to the present case:

"One buying lands which the vendor has incumbered by mortgage, to secure a debt to third person, and expressly agreeing with the seller and the mortgagee to pay such debt, which is deducted from the cash payment required, subordinates his title to the mortgage, and is estopped from denying its validity; and the mortgage being duly recorded, a purchaser of the lands at a sale on execution against the vendee, merely succeeds to his rights, and is also bound by the estoppel."

In all the other three cases it was found that the interests, whether of title or of mortgage, were of record, and the parties had either expressly or by operation of law acquired subject thereto, and hence could not be heard to dispute them. I find no inconsistency therein with my views in the present case.

I think the record shows that defendant conveyed to plaintiff a valid title to the mineral rights, and it has no standing to recover back the money paid.

For these reasons, I respectfully dissent from the opinion of the majority.