166 So. 133

**STATE ex rel. PORTERIE, Atty. Gen., v. GRACE, Register of State Land Office, et al.**

No. 33707.

Feb. 3, 1936.

Gaston L. Porterie, Atty. Gen., and George M. Wallace and James O'Connor, Asst. Attys. Gen., for appellant.

F. A. Blanche, of Baton Rouge, for appellees Governor and Register of State Land Office.

Denegre, Leovy & Chaffe, of New Orleans, for appellee Southern Sulphur Corporation.

O'NIELL, Chief Justice.

In February, 1928, Governor Simpson, acting under authority of Act No. 30 of the Extra Session of 1915, as amended by Act No. 315 of 1926, granted four mineral leases, designated as leases No. 190, 192, 194 and 195, on certain lands and beds of lakes and bays on the gulf coast. The leases were assigned to, and are now held by, the Southern Sulphur Corporation. Each contract of lease contained provisions to the effect that during five years from the date of the contract the lessee had the right to continue the lease in force, without commencing drilling operations, by paying an annual rental stipulated in the contract. The rentals were paid regularly, to the amount of $135,210; and drilling operations were begun on each area covered by the leases within the five years, and were continued in accordance with the terms of the contracts. The total expense of drilling operations of the Southern Sulphur Corporation amounted to $184,655.10. Each contract contained a provision to the effect that, if oil, gas, or other minerals should be produced, the lease should be thereby continued in force as long as oil, gas, or other minerals should be produced; that, if for any cause beyond the control of the lessee any well should cease to produce, the cessation should not affect the lease, provided the lessee should proceed with reasonable diligence to work on the well so as to cause it to produce; that, if the lessee should fail to comply with such stipulations after having drilled wells that produced oil, gas, or other minerals, a surrender of the undeveloped portion of the property might be demanded and become effective on a formal putting in default by sixty days' notice to the lessee to comply with the stipulation. And each contract contained the following clause:

"It is understood that at the end of five (5) years the lessee shall declare in writing what portion or portions of the leased premises are not at such time in his judgment developed, and whether the same be by him judged capable of development as

herein contemplated; and if there shall be such portions undeveloped and capable of development the lessee shall proceed to further develop the property, locating a sufficient number of wells at such reasonably close intervals as consistent with the interest of both parties as to accomplish a reasonably profitable development of the entire tract as herein contemplated."

On the 23d of December, 1934, the register of the state land office, with the approval of the Governor, and under authority of Act No. 9 of the Extra Session of 1928, made a written agreement with the Southern Sulphur Corporation, in which it was declared:

That a controversy had arisen over the four contracts of lease, and particularly as to the right of the state to lease to other parties a portion of the property covered by lease No. 192.

That the state was vitally interested in the development of the leases on a broad scale and had no desire to interfere with the vested rights of the owner of the leases.

That the Southern Sulphur Corporation had been diligently engaged in drilling and prospecting on the leased premises.

That, without in any way varying or departing from the requirements of the original leases, but in conformity with the authority conferred by Act No. 9 of the Extra Session of 1928, the register of the state land office, with the approval of the Governor of the state, did enter into the

following agreement with the Southern Sulphur Corporation, viz.:

The Southern Sulphur Corporation waived and released all of its right, title, or claim to certain portions, being approximately 11,000 acres of land, partly underlying the gulf waters, at Grand Isle, and covered by lease No. 192.

That the four leases (except as to that part of lease No. 192 which was released) remained subsisting and valid leases, subject to certain stipulated obligations on the part of the Southern Sulphur Corporation to begin and prosecute the drilling of wells under each of the four leases.

That, at the end of three years from the 1st day of January, 1935, the sulphur corporation should be allowed to retain out of all of the acreage leased a total of 500,000 acres, and should tender to the state a written relinquishment of the leases on all other of the lands, and file for record in the state land office a description of the lands selected to be retained by the sulphur corporation.

That it should be a consideration for this transaction that the 500,000 acres to be retained under lease by the sulphur corporation should be drilled and developed with reasonable diligence and expedition, in accordance with the terms of the original leases, except as modified by this agreement.

That a failure of the sulphur corporation to file the release of the acreage, over and above the 500,000 acres to be retained, should entitle the state to make the selection and award of the 500,000 acres to the

sulphur corporation and retain all other acreage covered by the leases, at the expense of the sulphur corporation, and that the sulphur corporation should make all necessary surveys at its expense and file the map or maps of the selected acreage in the state land office on or before the 1st day of January, 1938.

And that, except as otherwise expressed in this agreement, all of the terms and stipulations of the four leases should remain in full force and effect.

On the 30th day of August, 1935, the register of the state land office, with the approval of the Governor and under authority of Act No. 9 of the Extra Session of 1928, entered into another written agreement with the Southern Sulphur Corporation, declaring that certain disputes or controversies had arisen between the parties with reference to the interpretation of the covenants, conditions and obligations in the four leases, and the agreement dated December 23, 1934; that the sulphur corporation had diligently engaged in the drilling and prospecting for oil, gas and other minerals in the properties covered by each of the four leases, and had complied with all of the conditions and obligations of the contracts of lease and of the agreement dated December 23, 1934; that the sulphur corporation had the right, from time to time, to abandon and release all or part of the properties covered by each lease, and to retain the balance of the properties, under the conditions and obligations of the leases; and that the sulphur corporation did thereby abandon and relinquish the acreage described in the contract dated the 23d of December, 1934. The sulphur corporation declared that out of the acreage covered by lease No. 190 an area not exceeding 100,000 acres was capable of development, that out of the acreage covered by lease No. 192, exclusive of the acreage already released, an area not exceeding 200,000 acres was capable of development, that out of the acreage covered by lease No. 194 an area not exceeding 100,000 acres was capable of development, and that out of the acreage covered by lease No. 195 an area not exceeding 100,000 acres was capable of development; that the sulphur corporation would, before the 31st day of December, 1937, set forth, in writing, and file with the register of the state land office, a description of the portion or portions of the property developed or undeveloped and capable of development; that the acreage set forth in the description to be so filed should continue to be retained under the original leases, and thereupon all of the other portion or portions of the properties under lease should be released. It was agreed that a failure of the sulphur corporation to file such description would entitle the state to make the description and file it with the register of the state land office, with the same effect as if it had been filed by the sulphur corporation. It was agreed that reasonable development, within the period ending on the 31st day of December, 1937, should consist of the beginning of the drilling of a new well on each of the four leases within eighteen months from the 1st day of January, 1935, and the prosecution of the drilling thereof with reasonable diligence

and expedition, so that after one well would be completed on each lease another well would be begun within sixty days, and be prosecuted to completion. It was agreed that reasonable development after the 31st day of December, 1937, would consist of the locating and drilling, with reasonable diligence, of a sufficient number of wells at such close intervals as would be consistent with the interest of both parties, and so as to accomplish reasonably profitable development of the leases. It was agreed that such reasonable development would have the effect of maintaining each lease in full force and effect without the necessity of any further or other drilling operations. It was agreed that, except as otherwise expressly provided in this agreement, all of the terms and stipulations of each of the four leases were to remain in full force and effect. And it was declared, finally, that, although for convenience this agreement had reference to the four leases, each lease should retain its independence as a separate lease.

The Attorney General brought this suit, in the name of the state, to annul the two agreements, the one dated the 23d of December, 1934, and the one dated the 30th of August, 1935, on the ground, first, that Act No. 9 of the Extra Session of 1928, under authority of which the agreements were entered into, was unconstitutional; and, second, and in the alternative, that, if the court should declare the statute valid, the Governor and the register of the state land office, in the agreements com-

plained of, abused the discretion vested in them by the statute. The judge of the district court decided in favor of the defendants, the Governor, the register of the state land office and the Southern Sulphur Corporation, declaring that Act No. 9 of the Extra Session of 1928 was constitutional and dismissing the suit of the Attorney General. The decree recognizes the validity of the contracts between the state and the Southern Sulphur Corporation, dated the 23d of December, 1934, and the 30th of August, 1935, and declares that the delay of eighteen months allowed in the contracts, from the 1st day of January, 1935, for beginning the drilling of a new well on each of the several areas covered by the leases No. 190, No. 192, No. 194 and No. 195, is extended for a period equal to the time which will have elapsed from the filing of this suit to its termination. The Attorney General has appealed from the decision.

The Attorney General urges two distinct reasons for contending that Act No. 9 of the Extra Session of 1928 is unconstitutional, viz.: First, that the statute is an attempt to vest judicial power in the Governor and the register of the state land office, in violation of section 1 of article 7 of the Constitution, which provides that the judicial power shall be vested only in the courts; and, second, that the statute undertakes to authorize the relinquishment of debts or liabilities or obligations due to the state, in violation of section 13 of article 4 of the Constitution, which forbids the Legislature to relinquish or to author-

ize the relinquishment of any indebtedness, liability or obligation of any corporation or individual to the state.

Act No. 9 of the Extra Session of 1928 authorizes the register of the state land office, as the representative of the state, to settle and finally determine, by agreement with the holders of mineral leases from the state and with the approval of the Governor, all matters, questions or controversies arising as to the interpretation of such leases and the performance of the covenants, conditions, obligations and stipulations thereof. The statute ends with the expression, "and full, final and plenary authority to that end and for that purpose is hereby vested in said officers."

If the expression, "and full, final and plenary authority to that end and for that purpose is hereby vested in said officers," should be construed literally, as giving to the Governor and the register of the state land office the absolute and final authority to do as they see fit with the rights and interests of the state in her mineral leases and as putting the acts of these officers in that respect beyond the control of the courts, the statute would be unconstitutional. But the statute is not essentially subject to such a literal construction as would destroy its validity. In fact, this vigorous language which purports to vest plenary authority in the Governor and the register of the state land office, in the settling or adjusting of controversies arising between the state and her lessees, may be disregarded, without affecting in any way the object or purpose of the statute —to designate the officers who are to perform these administrative functions as the agents of the state. The statute must be read and construed with reference to the other statute on the same subject; that is, Act No. 30 of the Extra Session of 1915, as amended by Act No. 315 of 1926, which places the granting of mineral leases in the hands of. the Governor and the register of the state land office, and which necessarily invests the Governor with much discretion in the naming of the terms and conditions of such contracts. It is not contended or suggested that Act No. 30 of the Extra Session of 1915 or Act No. 315 of 1926 is unconstitutional. In the very nature of things, the officers who are vested with the authority to make contracts of lease as the agents of the state and to exercise some discretion in fixing the terms and conditions of such contracts ought to have the authority and the necessary discretion to determine whether the terms and conditions of the contracts are complied with. The exercise of such authority is only an administrative function, and does not form part of the "judicial power" referred to in the Constitution as being vested in the courts. The exercise of the authority given by Act No. 9 of the Extra Session of 1928 is subject to the "judicial power" of the courts and to investigation by the courts in any instance where a party having an interest sets forth a just cause for complaint. For that reason Act No. 9 of the Extra Session of 1928 is not violative of section 1 of article 7 of the Constitution, investing the judicial power in the courts.

It is conceded in the brief for the Governor and the register of the state land office that the only authority that is conferred upon them by this statute is the authority to determine primarily the meaning of the terms and conditions of the mineral leases granted by the state, to the end of determining whether the terms and conditions of such contracts are complied with; hence it is conceded by these officials that the statute does not purport or attempt to deprive the courts of jurisdiction over questions or controversies that have been decided by the Governor and the register of the state land office under authority of this statute. The only limitation of authority in that respect is that the courts will not place their judgment above that of the executive or administrative officers who are designated by statute as the agents of the state in the determination of matters peculiarly within the knowledge of such officers, and as to which the necessary discretion is confided in them specifically by the statute which makes them the agents of the state. That does not mean that the officers so designated are invested with "judicial power" in the sense in which that power is exercised by the courts. Conery v. New Orleans Water-Works Co., 41 La.Ann. 910, 7 So. 8; Holmes v. Tennessee Coal, Iron & Railroad Co., 49 La.Ann. 1465, 22 So. 403; Edison Electric Co. v. City of New Orleans, 130 La. 693, 58 So. 512; State v. Guidry, 142 La. 422, 76 So. 843. In the latter case it was said that the right of the Legislature to delegate to an administrative board or agency the authority to

determine the facts upon which the law is to be applied was beyond dispute.

■ Inasmuch as section 1 of article 3 of the Constitution of the United States, which declares that the "judicial power" shall be vested in the courts, is in language similar to that of section 1 of article 7 of the Constitution of Louisiana, the decisions of the Supreme Court of the United States are the best of authority on this subject. The question has arisen often, as to whether a statute which delegates the authority to an administrative officer or board to find the facts upon which the law is to be applied is a delegation of judicial power; and the question has arisen often, as it arose in State v. Guidry, supra, as to whether the delegation of such authority to an administrative officer or board is a delegation of legislative power. It is recognized consistently that a statute which delegates to an administrative officer or board or commission the authority to find the facts upon which the law is to be applied is not a delegation of either the judicial or the legislative power. Bartlett v. Kane, 16 How. (57 U.S.) 263, 14 L.Ed. 931; Passavant & Co. v. United States, 148 U.S. 214, 13 S. Ct. 572, 37 L.Ed. 426; United States ex rel. John Turner v. William Williams, Commissioner of Immigration, 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979; United States v. Ju Toy, 198 U.S. 253, 25 S.Ct. 644, 49 L.Ed. 1040; Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523; Oceanic Steam Navigation Co. v. Stranahan, 214 U.S. 320, 29 S.Ct. 671, 53 L.Ed. 1013; Mutual Film Corpo-

ration v. Industrial Commission, 236 U.S. 230, 35 S.Ct. 387, 59 L.Ed. 552, Ann.Cas. 1916C, 296; J. W. Hampton, Jr., & Co., v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624; 6 R.C.L. §§ 174–178, pp. 174–177.

Act No. 9 of the Extra Session of 1928 is a necessary complement of the provisions of Act No. 30 of the Extra Session of 1915, as amended by Act No. 315 of 1926. Act No. 30 of the Extra Session of 1915, as amended, declares that the Governor "is hereby vested with full authority to execute any lease or leases so granted, to the highest bidders therefor, under such terms and conditions as to him seem proper," provided that the royalties shall be not less than the minimum scale prescribed by the statute. The constitutionality of that statute, as amended, is not questioned. Of course, if a Governor of the state, after granting a mineral lease to the highest bidder, on the terms and conditions fixed by him and duly advertised, should thereafter arbitrarily approve a material change in the terms or conditions of the lease, to the advantage of the grantee and to the prejudice of others who might have bid upon the lease, the approval of such a change in the terms or conditions of the lease would be an abuse of the authority vested in the Governor and the register of the state land office by Act No. 9 of the Extra Session of 1928, and would be subject to annulment by the courts. But we do not find any such abuse of authority in this case.

The complaint of the Attorney General that there was a release or relinquishment of liabilities or obligations of the Southern Sulphur Corporation to the state has reference more to the contracts, dated the 23d of December, 1934, and the 30th of August, 1935, than to the statute itself. The liabilities or obligations of the sulphur corporation which are said to have been released were, first, to begin drilling operations within the time specified in the original contracts of lease and to prosecute the work with reasonable diligence and to the depth stipulated; second, to continue drilling wells in such close succession that not less than sixty days should elapse between the cessation or abandonment of work on one well and the beginning of work on another; and, third, to declare at the end of five years from the date of each lease what portion of the property was then, in the lessee's judgment, not developed, and whether the same was by him judged capable of development. The complaint has reference also and particularly to the agreement as to what should constitute reasonable development until the end of the year 1937.

The evidence introduced by the defendants, which was not contradicted, shows that the Southern Sulphur Corporation did begin drilling a well on each of the four leases within the five years, and did continue the operations with due diligence. The other complaints of the Attorney General have reference to the paragraph in the original leases, requiring the lessee to declare "at the end of five years" what portion of the property was, in his judgment, not developed, and whether the same was

"by him judged capable of development," etc. That paragraph left considerable room for interpretation, and some latitude in the obligations of the lessee. We do not find that there was any abuse of discretion on the part of the register of the state land office or of the Governor, or a gratuitous or actual relinquishment of any obligation of the sulphur corporation, but merely an exchange of obligations, in the settlement and adjustment of the relative rights of the parties to the contracts dated the 23d of December, 1934, and the 30th of August, 1935.

So far as the decree of the district court allows an extension of the time within which drilling operations were to commence under the agreements dated the 23d of December, 1934, and the 30th of August, 1935, the decree is supported by the following decisions, which maintain that, when drilling operations under a mineral lease have been prevented or interfered with by an unsuccessful lawsuit against the lessee, the time allowed by the contract of lease for the beginning of drilling operations should be extended for an additional time equal to the time during which the litigation is pending, viz.: Leonard v. Busch-Everett Co., 139 La. 1099, 72 So. 749; Keen v. Logan, 147 La. 80, 84 So. 501; Standard Oil Co. v. Webb, 149 La. 245, 88 So. 808; Pace Lake Gas Co. v. United Carbon Co., 177 La. 529, 148 So. 699.

The judgment appealed from is affirmed.