I So.2d 89

KNIGHT v. BLACKWELL OIL & GAS
CO. et al.

No. 35880.

March 3, 1941.

Whitfield Jack and Wellborn Jack, both of Shreveport, for appellant.

Smitherman & Smitherman and F. Leonard Hargrove, all of Shreveport, for appellees.

HIGGINS, Justice.

The plaintiff, the landowner and lessor, instituted this suit under Act 168 of 1920 against the defendants, the lessee and his assignees, to cancel an oil and gas lease, alleging that the lease had expired under its own terms. The defendant denied that the lease had expired and averred that it was a two-year "paid-up" lease, and that the interpretation placed by the plaintiff upon the controversial provision therein was contrary to the clear and unambiguous clauses of the contract. There was judgment in favor of the defendants dismissing the plaintiff's suit, and he has appealed.

The plaintiff's property known as the Moss Plantation containing 1,000 acres was under an oil and gas lease in favor of the Woodley Petroleum Company, which was operating two shallow gas wells thereon. The plaintiff was entitled to free gas from these two wells, in order to operate his gin and for use in his houses. A controversy arose between the plaintiff and the Petroleum Company and he instituted suit against it. About six months before the present lease was entered into with the lessee, that suit was settled. On March 18, 1939, the plaintiff received a letter from the Petroleum Company informing him of its intention to abandon the two shallow gas wells and offered to sell the wells to the plaintiff for $6,500 cash, representing the salvage value thereof. As plaintiff wished to continue the supply of gas for his own uses, upon being approached by the lessee (who had around Moss Plantation a block of leases covering about 12,000 acres of land which he had acquired from various other plantation owners without paying any cash bonus), he signified his willingness to lease the property to him. After discussions and negotiations, it was agreed that the plaintiff would accept the Petroleum Company's offer and that the lessee would pay him the sum of $6,500 cash for a two-year "paid-up" lease with the right to operate, use and sell gas from the two existing shallow wells, for which the plaintiff was to receive free gas to be used for his gin and houses. It was also provided that the lessee could not sell or salvage either of the gas wells and that he would return them to the plaintiff upon the expiration of the lease. This understanding was confirmed in a letter dated April 1, 1939, by lessee to the plaintiff and a formal lease was executed on April 14, 1939. The present contro-

versy results from the different interpretations placed by the parties upon the following paragraph contained in the lease:

"In addition to the cash consideration hereinabove specified, Lessee agrees, binds and obligates himself to begin drilling a test well for the production of oil or gas at a point on that property known as the Caspiana Plantation belonging to the heirs of W. J. Hutchinson, located north of the T. & P. Railroad right of way at a distance not greater than six hundred sixty (660) feet from the west boundary line of the property herein leased, on or before August 10, 1939, and to prosecute the drilling of said well with due diligence to a depth of six thousand (6,000) feet unless oil or gas should be produced therefrom in paying quantities at a shallower depth but below the Woodbine same presently producing in that area at approximately two thousand four hundred (2,400) feet, *and if said test well so drilled at said above described location should be productive of oil or gas in paying quantities to the extent that said well is completed as an oil well or as a gas well producing oil or gas in paying quantities, then to begin the actual drilling of a well upon the property herein leased at an offset location to the well so drilled upon said Caspiana property, or at another location acceptable to Lessor within sixty (60) days after the completion of said first test well*, and to prosecute the drilling of said well with all reasonable diligence until same has been drilled to a depth of six thousand (6,000) feet unless oil or gas is found in paying quantities at a lesser depth but below the Woodbine formation. Should however, the first well (the Caspiana Plantation well) be productive of oil or gas in such small quantities as in the opinion of Lessee to render the drilling of additional wells uneconomic, then Lessee agrees to release the property herein leased within sixty (60) days from the final completion of said Caspiana well, and Lessee shall be relieved from any obligation to drill said second test well." (Italics ours.)

The lessee fully complied with his obligations by drilling the test well, Hutchinson No. 2, on the Caspiana Plantation, which resulted in a dry hole, the operation having been started on or before August 10, 1939, and was completed on September 20, 1939, to a depth of slightly more than 6,000 feet. The lessee obtained a permit from the Conservation Department of the State to temporarily abandon this well, and left it in a condition that would permit further operation.

The plaintiff contends that the lease he granted the lessee expired sixty days after the completion of the test well known as Hutchinson No. 2 on the Caspiana Plantation, because the lessee did not within that period of time drill the offset well on the Moss Plantation as required by the terms of the lease.

The defendants dispute this and say that in the absence of a producing oil and gas well on the Caspiana Plantation there was no reason or obligation, under the plain terms of the lease, to drill an offset well on plaintiff's land or Moss Plantation, and that the lease was to remain in effect for its two-year period without any drilling thereon.

As we view the lease there is no ambiguity or uncertainty in its provisions and it is free from doubt as to the intention of the parties. The words "in paying quantities" can mean the production of oil or gas in such a quantity as will pay a small profit over operation costs of the well, although the expense of drilling and equipping the well may never be paid, and thus, the operation as a whole might result in a loss to the lessee. Under such circumstances, the well might be operated by the lessee, in order to recoup some of the drilling and equipment costs. However, if the lease required the lessee to drill other wells and similar results followed, it is clear that the operations under the lease would not only prove unprofitable, but would definitely culminate in serious loss. To prevent the lessee from being placed in such a dilemma the parties agreed to the provision contained in the last-quoted sentence of the foregoing paragraph of the lease, giving the lessee the right to surrender the lease without drilling any more wells. Under that stipulation, the lessee would be protected against the useless expenditure of money in the further attempted development of the property and the owner would have his property free of the lease. The test well, Hutchinson No. 2, did not produce oil or gas in small quantities but proved to be a dry hole. If this test well had proved to be productive of oil and gas in paying quantities, the lease obligated the lessee to drill the offset well on the Moss Plantation within sixty days from the completion of the test well or Hutchinson No. 2. The obvious purpose of this stipulation was to prevent the plaintiff's land from being drained of oil and gas by a producing well on the adjoining tract. As the test well proved to be unsuccessful, or a dry hole, nothing was drained from the plaintiff's land, and, consequently, there was no reason or obligation on the part of the lessee to drill the offset well. It is, therefore, impossible for the plaintiff to successfully contend that since the test well resulted in a dry hole that that situation was identical, as far as the provisions of the lease are concerned, with a situation where the test well produced such a small amount of oil and gas as to make the drilling of additional wells on the leased property uneconomical, because in the latter instance oil or gas would be drained from under plaintiff's land.

The effect of the plaintiff's argument, if adopted, would add to the agreement of the parties a further provision that, should the Hutchinson No. 2 test well on the Caspiana Plantation prove to be a dry hole, then the lessee must surrender the lease within sixty days from the completion of the unsuccessful drilling. The lease does not expressly or impliedly contain such a provision. On the contrary, the clauses of the lease are unreconcilable with that view. For instance, the provision of the lease with reference to the two-year paid-up term, without any other drilling (for which lease the lessee paid the plaintiff $6,500 and other consideration), would be nullified if plaintiff's version is accepted as being correct. There is no stipulation in the lease that it shall come to an end prior to the expiration of the two-year period, in the event of the failure of the lessee to drill a well on the Moss Plantation after com-

pleting a dry hole on the Caspiana Plantation. But there is a clause in the lease plainly obligating the lessee to drill the offset well within sixty days if the test well were successful. Obviously that situation is totally different from the one where the test well proved to be a dry hole, as in the instant case.

■ By adopting the lessee's interpretation of the lease, all of the provisions contained therein are given effect, whereas, by following the lessor's views, the elimination of important clauses therefrom would be necessary. The latter method of construction is contrary to the well-recognized rules of interpretation contained in our Civil Code and the jurisprudence, which support the lessee's position in this case. Articles 1945 through 1962, inclusive, Revised Civil Code; Gautreaux et al. v. Harang, et al., 190 La. 1060, 183 So. 349; Lozes v. Segura Sugar Co., Ltd., 52 La.Ann. 1844, 28 So. 249, and Glassell v. Richardson Oil Co., 150 La. 999, 91 So. 431.

The defendants, in their brief, point out that the two-year period of the lease will expire by its terms on April 14, 1941, unless lessee begins drilling operations thereunder before that date and that the bringing of this suit has placed the lessor in default and prevented the lessee from keeping his lease in force by drilling a well on the leased land. He asks that the judgment of the district court be amended so as to state that the lease is extended for a period equal to the number of days between December 26, 1939, the date of the plaintiff's demand for cancellation of the lease, and the date on which the decree of this court becomes final. In support of their position, they cite the case of Fomby v. Columbia County Development Co., 155 La. 705, 99 So. 537, 542, wherein this court stated: " * * * By filing and prosecuting these suits, plaintiffs have made it utterly impracticable for the assignees of the lessee to exercise the rights granted by the leases. Having made it thus impracticable by their own acts, plaintiffs are not in position to contend that the leases have expired. The period of this litigation should not be included in determining when the leases expire. Gulf Refining Co. v. Hayne, 148 La. 340, 86 So. 891; Standard Oil Co. v. Webb, 149 La. 245, 98 So. 808."

■■ While it appears that the above case and the authorities cited therein sustain the lessee's contention, we have no right to amend the judgment of the district court, because the defendants did not raise the above point in the trial court and have not appealed nor have they answered the appeal taken by the plaintiff. Of course, if the lessor later insists that the lease has expired without allowing the period of time that this litigation has covered, in extending the lease, the defendants would have the right to interpose such a defense.

For the reasons assigned, the judgment appealed from is affirmed.

ODOM, J., absent.