41 So.2d 724

**VANCE et al. v. HURLEY et al.**

No. 39052.

June 30, 1949.

Francis H. Alston, Logansport, for plaintiffs and appellees.

Smitherman, Smitherman & Purcell, Blanchard, Goldstein, Walker & O'Quin, Shreveport, for defendants and appellants.

FOURNET, Justice.

This is a suit for cancellation of a mineral lease on the ground that it had expired under its own terms since the well located on the property is not producing oil and gas in paying quantities; in the alternative, for the non-payment of a production payment due under the terms of the lease in the amount of $9,517.50, as well as for judgment covering this amount and for attorney fees of $5,000.

The defendants denied the well drilled on the leased premises is not producing in paying quantities, averring, in the alternative, that if the lease is cancelled, then that there be judgment in their favor and against the plaintiffs for the cost of drilling the well.

There was judgment in favor of the plaintiffs ordering the cancellation of the lease and awarding them attorney fees of $2,500. The defendants have appealed and the plaintiffs, answering this appeal, re-

assert their position as set out in their petition but ask that the attorney fees be increased to $5,000.

On July 6, 1944, for a consideration of $2,600 in cash, the plaintiffs, Mrs. Evelyn Vance, Mrs. Eva A. Price, and Chesley Price, executed a mineral lease in favor of the defendants, Ed E. Hurley and G. H. Vaughn covering 260 acres of land lying in Section 34 of De Soto Parish, the lessees obligating themselves thereunder to drill a well on the leased premises during the primary term of six months to pay the plaintiffs a royalty of ⅛th and to pay $10,400 out of ¼th of the remaining ⅞ths production from the well. This lease was recorded in C.O.B. 153, Folio 421 on May 16, 1945. Contemporaneously with the execution of the lease, however, the defendants signed a document agreeing to pay so much of the $10,500 production payment as remained unpaid at the end of three years, provided the well drilled under the terms of the lease were still producing or capable of producing oil, gas, or other minerals in paying quantities at that time.

The lease contained the further stipulation that it would continue in effect after its primary term so long as oil, gas, and other minerals were produced in paying quantities and under the terms of the contract the lessees were authorized to enter into pooling agreements for the unitization of the area if necessarily required to do so. There is also provision in the contract that the lease will be subject to all of the federal and state laws, executive orders, and rules and regulations.

Within the primary term of the lease the lessees began the drilling of a well that was finally completed as a producer in June of 1945, but under orders issued by the Commissioner of Conservation in November of 1944 affecting all of the land lying in Section 34, this property had been included in a 640-acre unit. In compliance with these orders and in conformity with the lease contract, the plaintiffs only received $^{260}/_{640}$ths of the ⅛th royalty provided for in the contract, which amount totalled $504.32 during the 25-month period following the completion of the well. But it appears that during this same period of time they were not paid their pro-rata share of the production payment under the ¼th of ⅞ths production clause of the lease, which payment at that time amounted to $882.50. It was only after the lessors addressed a letter to the defendants in July of 1947 demanding full settlement of the production payment of $10,400 that this $882.50 was paid to them, thus leaving a balance due and payable by the lessees personally of $9,517.50, provided the well is producing or capable of producing in paying quantities. After the plaintiffs had followed up their demands with respect to this production payment with a request for the cancellation of the lease, and following further negotiations, the defendants offered to pay the plaintiffs the balance due on the production payment, but the lessors refused this

offer because it was conditioned upon their acknowledgment that the well was producing in paying quantities. This suit followed.

In support of their position the plaintiffs rely on the decisions of this court in the cases of Caldwell v. Alton Oil Company, Inc., 161 La. 139, 108 So. 314, and Logan v. Tholl Oil Co., Inc., 189 La. 645, 180 So. 473, arguing that since they have received royalty of only $504.32 or approximately $240 a year for a lease covering 260 acres, amounting to 96¢ per acre per year, such production can not be said to be in paying quantities within the meaning of the contract.

A study and analysis of the Logan and Caldwell cases will show that the former is based upon the holding in the latter, wherein it was pointed out [189 La. 645, 180 So. 475]: "This court has repeatedly held that the main consideration of such a lease is the development of the land for oil and gas and that the lessee must either develop with reasonable diligence, or give up the lease." In the course of the opinion there is the further observation: "A development that falls short of a reasonable production which would bring a net profit to the lessee and furnish an adequate consideration to the lessor for the continuance of the lease might well be said to be no development at all within the contemplation of the parties."

There is no doubt that the production from the well that has been drilled on the leased premises has been a disappointment to both the plaintiffs and the defendants, but there is no suggestion that the development of the lease has not been prosecuted with reasonable diligence. On the contrary, it appears that the defendants have made every reasonable effort that could be expected of them, and at great expense, to increase the production, and that unless oil, gas, or other minerals are discovered in this area from a different strata, or unless this well is abandoned, they will be unable to drill another well within the unit in which this property is situated. So it would appear that the *development* of this property has been within the contemplation of the parties. Of course, if the lease had not been unitized, the plaintiffs would have received under its terms royalties amounting to approximately $600 a year, or $2.30 per acre per year. The fact that they are only receiving $240 a year is clearly within the terms of the contract itself.

■  This court, in the case of Knight v. Blackwell Oil & Gas Co., 197 La. 237, 1 So.2d 89, 91, very aptly pointed out that "The words *'in paying quantities'* can mean the production of oil or gas in such a quantity as will pay a small profit over operation costs of the well, although the expense of drilling and equipping the well may never be paid, and thus, the operation as a whole might result in a loss to the lessee. Under such circumstances, the well might be operated by the lessee, in order to recoup some of the drilling and equipment costs."

Under the facts of this case it appears that there was a net profit of $3,926.28 realized from the operation of this well during the 25 months following its completion as a producer. But counsel argues that inasmuch as the defendants only received $^{260}/_{640}$ths of this amount under the unitization orders, and prior to the payment of the production payment of $882.50 they showed a net profit of only $1,595.05, if the well is considered as a producer in paying quantities, then the additional amount of $9,517.50 becomes due and payable and, necessarily, the defendants are operating at a loss of $8,804.95.

That such result was never intended nor contemplated by the parties is clearly evidenced by the stipulation in the contract: "It is * * * agreed that this production payment ($10,400) shall not place any added burden on Lessee to drill and develop said land, and *said payment is payable out of production only if, as and when produced and had.*" (Brackets and italics ours.)

■■ Moreover, it is our opinion that this promise was given as an additional consideration for the execution of the lease and should not be considered a part of the cost of production any more than the cash consideration of $2,600. In fact, even considering the amount due and paid under the terms of the lease out of production ($882.- 50) as a part of the cost of production, the lessees, nevertheless, still show a net profit of $702.55. The remainder of the $10,400,

or $9,517.50, is due and payable personally by the lessees only because of their personal guarantee and only in the event the well is producing or is capable of producing in paying quantities on the third anniversary of the lease.

The plaintiffs by their own actions showed they never entertained any doubt but that the well was producing in paying quantities, for the record shows although they were not satisfied with the production of the well, they never voiced any serious complaint with respect thereto, but, instead accepted the monthly royalty payments due thereunder during more than two years and that it was only upon the expiration of the third year, and only after they had failed in their effort to collect from their lessees personally under the contemporaneous agreement, that they first entertained the idea of cancelling the lease on this ground.

Furthermore, if the plaintiffs had entertained any doubt that the lease was being properly operated and developed in accordance with the contract and desired its cancellation for this purpose, they overlooked the provision in the contract that "In the event lessor considers that operations are not being conducted in compliance with this contract, lessee shall be notified in writing of the facts relied upon as constituting a breach hereof and lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument," as the

record shows they failed to give such notice. As pointed out above, the plaintiffs first demanded by letter the payment of the production payment of $10,400 after the lapse of the three-year period. Upon the failure of the defendants to promptly meet their demand, it was repeated through counsel employed for that purpose and this attorney advised the defendants suit would follow if the amount was not promptly paid. It was only after the negotiations that followed this demand had reached an impasse that the cancellation of the lease was demanded, and then the defendants were notified the demand must be met within 10 days or else suit would follow.

■ The fact that the lessees have the right under the lease to cap any well drilled when there is a lack of demand or market and yet keep the lease in effect by paying $2,000 per well per year, not, however, exceeding three years, does not mean, as contended by the plaintiffs, that the lease can be cancelled if a well produces in quantities that do not net the lessors royalties amounting to $2,000 per well per year.

Had the lessors intended this figure to be the standard royalty return they expected from each well on their property, they would have so stipulated in their contract. Instead, the provision is to the effect that the lease will be kept in force and effect so long as the well is producing oil, gas, or other minerals "in paying quantities," which clause, in the oil indus-try and in legal circles, as well as in the jurisprudence of this state, has a well-defined meaning. It is to be observed that according to the allegations of their own petition the wells in the immediate vicinity of plaintiffs' property are producing approximately $5\frac{1}{2}$ times the amount being produced by the well drilled on the leased premises, bringing to their respective lessors a return of $5.40 an acre a year, and even this amount falls short of the $2,000 figure set for the right of the lessees to cap the well drilled by them because of short demand and lack of market.

■ It is our opinion, therefore, that the well drilled on the property of the plaintiffs is producing in paying quantities within the meaning and comtemplation of the parties as set out in the terms of their contract of lease.

■ It necessarily follows that since the plaintiffs have only received $882.50 of the $10,400 production payment, the defendants are bound by their personal agreement to pay this remaining balance.

■ The alternative demand urged for the cancellation of the lease, that is, the failure of the defendants to pay the portion of the production payment unpaid at the end of three years, is equally without merit, for, as above pointed out, the amount due under Clause No. 10 of the lease ($\frac{1}{4}$ of $\frac{7}{8}$ths of the production), which amounted to $882.50 at the time the $9,517.50 balance was demanded, had been paid to and accepted by the plaintiffs and the obligation

of the lessees to pay the remaining portion of the $10,400 production payment only became due and payable by them under their personal agreement at the end of three years from the date of the contract, and this agreement was conditioned upon the well producing or being capable of producing in paying quantities at that time, the existence of which fact the plaintiffs declined to acknowledge when the payment of $9,517.50 was proffered to them provided such acknowledgment was made.

In other words, plaintiffs were not entitled to recover this amount unless the well was producing or capable of producing in paying quantities and having declined to acknowledge that it was in order that their lessees might continue its operation unmolested, the lessees were well within their right to refuse to pay until that fact was established.

Moreover, as hereinabove pointed out, the payment of $10,400 out of the portion of the production set aside for that purpose under the terms of the lease was to be paid "if, as, and when" minerals were produced and was not a royalty in the true sense of the word but was, as stated in the contract, a "production payment" given as an added consideration for the execution of the lease. Necessarily, when the defendants personally bound themselves for the payment of this amount under the conditions above referred to, their failure to make payment in the absence of acknowledgment on the part of the plaintiffs that the well was producing in paying quantities, could not, under the very terms of the contract, afford them ground for the cancellation of the lease but could only serve as the basis for a judgment against them individually.

Since the basis for the claim for attorney fees is the cancellation of the lease, it necessarily follows that this claim must be denied under our conclusion that they are not entitled to that relief.

For the reasons assigned, the judgment appealed from is annulled and set aside and it is now ordered, adjudged, and decreed that there be judgment in favor of the plaintiffs, Mrs. Evelyn Vance, Mrs. Eva A. Price, and Chesley Price, and against the defendants, Ed E. Hurley and G. H. Vaughn, in the sum of $9,517.50, with 5% interest from judicial demand. Plaintiffs' main demand for cancellation of the lease executed in favor of the defendants on July 6, 1944, and recorded in Conveyance Records of De Soto Parish, Louisiana, in C. O. B. 153 Folio 421 on May 16, 1945 is denied. All costs in the lower court are to be paid by the defendants; all costs incurred on appeal here are to be paid by the plaintiffs.

O'NIELL, C. J., takes no part.