ON REHEARING
SANDERS, Justice.
We granted a rehearing in this case to reconsider our holding which cancelled the oil, gas and mineral lease held by Union Producing Company on a 98 acre tract of land owned by plaintiff[1] in Claiborne Parish.
A detailed statement of the facts was made in the original opinion of the Court. We need restate only the salient points here.
Executed March 10, 1947, the lease covered approximately 138 acres of land in Claiborne Parish. A 40 acre tract was located in Section 33, Township 23 North, Range 6 West. A contiguous 98 acre tract was located in Section 32 of the same township and range.
The lease stipulated a primary term of ten years from May 26, 1947. It also contained the usual provision that the lease would continue in effect as long thereafter as minerals were produced from the land by the lessee or the obligations in lieu of production were fulfilled.
Effective January 1, 1957, the State Commissioner of Conservation established a drilling unit composed of the South half of Section 33, which embraced the 40 acre tract under the Odom lease. On May 6, 1957, gas production was secured from a well located in this unit on land other than that of the plaintiff. The well was then shut in because of the lack of pipeline connections. On July 27, 1957, it was placed in production.
*83 On May 1, 1957, the lessee completed as a producer of gas a well known, as Tigner A-l, in Section 32 on land adjoining the 98 acre tract under the contested lease. Because of the lack of pipeline connections, the well was shut in. On May 20, 1957 (within the primary term of the lease), the Union Producing Company filed a declaration of unitization pooling the 98 acre tract into a 230 acre unit with the Tigner A-l well.
On June 11, 1957, the Union Producing 'Company mailed its check for the first quarterly shut-in royalty payment to the plaintiff-lessor. The plaintiff retained the check, but did not cash it.
On July 29, 1957, plaintiff-lessor instituted this suit seeking the cancellation of the lease on the entire 138 acre tract.
The plaintiff concedes that the lease has been preserved on the 40 acre tract in Section 33 located in the Conservation unit by the shut-in well in that unit under the ruling of this Court in Delatte v. Woods, 232 La. 341, 94 So,2d 281. The. legal dispute is thus narrowed to the 98 acre tract under lease in Section 32, which is embraced in the Tigner A vpluntary unit.
The plaintiff ■ centends that the lease has expired because of the lapse of its primary term without production on the lease tract or within the Tigner A unit. The' Tigner A-l well, it is contended, is not equivalent to production within the primary term of the lease because it was shut in prior to the formation of the voluntary unit, and no lieu royalty was paid prior to the expiration of the primary term. Plaintiff further contends that the well in the Conservation unit did not maintain the lease in effect as to this tract because the formation of the voluntary unit divided the lease obligations.
The Union Producing Company contends that the lease was preserved by the shut-in well in the voluntary unit and the timely payment of shut-in royalty. Alternatively, it contends that if the shut-in well in the voluntary unit did not preserve the lease, then the lease was not divided and is maintained by production from the Conservation unit.
These contentions are based upon the provisions, of the lease. Their resolution is not free from difficulty.
The lease contract is the law between the parties. It defines their legal rights and obligations. It must be construed as a whole, and so far as possible, effect must be given to all of its provisions.[2] *85 If an ambiguity is found, it must be construed against the lessee-defendant who prepared the contract.[3]
Analysis of the lease reveals that the effect of the shut-in well in the voluntary unit is anchored in Paragraphs 7 and 14.
Paragraph 14 provides in part:
“Lessee is hereby granted the power and right, at its option and without Lessors’ joinder or further consent, at any time while this lease is in force, cither before ór after production, to combine and pool the lease, mineral and royalty rights in all the lands covered by this lease or any portion thereof with any other land, lands, lease, leases, mineral and royalty rights or any of them, adjacent, adjoining or located within the immediate vicinity of this lease, whether owned by Lessee or some other person, firm or corporation so as to create by such combination and pooling one or more drilling or production units * * *. As betzveen the parties hereto the entire acreage so pooled into a drilling or production unit or units shall be treated, for all purposes except the payment of royalties and the lieu royalties on the production from the pooled unit or units, as if it zvere included in this lease. In lieu of the royalties and the lieu royalties elsewhere herein sped-' fied, Lessors shall receive, on the production from each unit created hereunder, only such proportion of the royalties stipulated herein as the amount of Lessors’ acreage (mineral or royalty rights) placed in the unit bears to the total acreage included in the particular unit involved * * *. If such operations be conducted on or production be secured from land in any pooled unit other than land covered by this lease, it shall have the same effect as to maintaining Lessors’ and Lessee’s rights in force hereunder as if such operations zvere on or such production from the land covered hereby, except that this effect shall be limited to the land covered hereby zvhich is included in such pooled unit.” (Italics ours)
The pertinent portion of Paragraph' 7 provides:
“(a) It is agreed that if a well (or wells) is completed hereunder which is capable of producing gas only, (including gasoline and condensate content) then until such time as such gas (including gasoline and condensate content) is sold or utilized off the premises, or in the event Lessee should at any time or times after gas (including gasoline and condensate content) is produced and sold off the premises from *87 such well or wells, deem it inadvisable to produce and sell gas from such well or wells, and Lessee shall discontinue the production thereof, which right is hereby granted, Lessee shall during such periods pay Lessors at the rate of $200.00 per year, payable quarterly, for each such well on the premises from which gas (including gasoline and condensate content) is not being produced; and so long as such lieu royalty is paid said well or wells shall he considered wells producing gas in paying quantities under Paragraph 2 hereof.
“(b) The Lessee may, from time to time, discontinue the production of gas, including its gasoline and condensate content, under the foregoing provisions of this section, provided, however, that the aggregate sum of the periods of such discontinuance shall not exceed ten (10) years.
“(c) The rights granted Lessee herein to discontinue the production of gas, including its gasoline and condensate content, may only be exercised so long as there is a well or wells on the leased premises capable of producing gas, including its gasoline and condensate content, in paying quantities.” (Italics ours)
The provisions in Paragraph 14 authorized the lessee to pool the lands covered by the léase either before or after production. On May 20, 1957, the lessee pooled the 98 acre tract with adjoining land in Section 32 on which was located the Tigner A-l shut-in gas well. It is clear, therefore, that the Union Producing Company created a valid production unit within the primary term of the lease.
Paragraph 7 of the lease granted to the Union Producing Company the right to defer the sale of gas or discontinue production of gas from a gas well “completed hereunder” so long as there was a well “on the leased premises” capable of producing gas in paying quantities.
Plaintiff strenuously urges that Paragraph 7 is inapplicable because the Tigner A-l well was not on the leased premises and was completed prior to the formation of the unit. Standing alone the provisions of Paragraph 7 appear to support this view. However, this paragraph cannot be isolated without doing violence to the lease. It must be construed in connection with Paragraph 14 which provides that the entire acreage so pooled shall be treated “as if it were included in the lease” and that production from other portions of the unit shall have the same effect in maintaining lessee’s rights as if the production was “from the land covered hereby.” Contrary to the contentions of plaintiff, the exception in Paragraph 14 of “the payment of royalties and lieu royalties” has reference only to the amottnt of the royalties due the lessor after *89 pooling. The additional language pertinent to the exception reads:
“ * * * In lieu of the royalties and the lieu royalties elsewhere herein specified, Lessors shall receive, on the production from each unit created hereunder, only such proportion of the royalties stipulated herein as the amount of Lessors’ acreage (mineral or royalty rights) placed in the unit bears to the total acreage included in the particular unit involved.”
The exception means only that the lieu royalty of $200.00 per year fixed in Paragraph 7 shall be prorated in conformity to unit ownership. The obligation to pay lieu royalty is not otherwise affected.
When the lease is thus construed, the shut-in well has the same effect as if it were physically located on plaintiff’s land. The convention of the parties has made it equivalent to a well “completed hereunder” and “on the leased premises” as provided in Paragraph 7. The amount of the royalty is reduced to that proportion of it which plaintiff’s acreage bears to the total acreage in the unit. In this respect, the plaintiff’s right to revenue is no different from that which it would have been if the wéll had been physically located on his land. See Hardy v. Union Producing Co., 207 La. 137, 20 So.2d 734. The shut-in well with the consequent accrual of lieu royalty was equivalent to production from all tracts within the unit. See LeBlanc v. Haynesville Mercantile Company, 230 La. 299, 88 So.2d 377. This preserved the lease beyond its primary term provided, of course, that the Union Producing Company did not default in the payment of the royalty. In Davis v. Laster, 242 La. 735, 138 So.2d 558, with Justice Summers as organ of the Court, we stated:
“The shut-in clause is specifically designed to enable the lessees to protect their investment in a shut-in well beyond the primary term—for, at the expiration of the primary term, they can no longer pay delay rentals to maintain the lease and they cannot produce the gas from the well they have discovered where no market is available. Therefore, if it were not for the shut-in clause, and the constructive production resulting from its application, the lease would be forfeited for expiration of its term at the end of the primary term.”
The well was shut in on May 1, 1957, and the unit was formed on May 20, 1957. The tender of lieu royalty was made on June 11, 1957. The payment was made to satisfy the obligation imposed on the lessee by Paragraphs 7 and 14 of the lease.
As to the time of payment of the lieu royalty, the lease provides only that it is to be “payable quarterly.” It contains no express provision for payment in advance or at any other specific time within the quar *91 ter. Hence, payment at any time within the quarterly period was proper.[4] The payment on June 11, 1957, was timely.
To support the cancellation of the present lease, plaintiff relies upon the decision of this Court in Wilcox v. Shell Oil Co., 226 La. 417, 76 So.2d 416. The lease in that casé provided:
“The commencement of a well or the completion of a well to production, and 'the production of oil or gas therefrom, on any portion of an operating unit in which all or any part of the land described herein is embraced shall have the same effect, under the terms of this lease, as if a well were commenced or completed on the land embraced by this lease.” (Italics ours)
Based on that specific provision, we held that a well completed and shut in before formation of the unit did not maintain the lease beyond its primary term. The Court stated:
“This well therefore was (1) not commenced on this unit, (2) not completed to production on this unit, and (3) production was not from a well completed to production on this unit, because each of these operations took place prior to the existence or establishment of the operating unit. * * * Thus; although there was a producing well on the unit on the rental date, that well was completed to production before the unit was formed, and production from it is not considered as production from the Wilcox lease.”
Unlike the lease in that case, the present lease authorizes pooling after production and does not require the production to be from a well completed to production on the unit. Because of the variant lease provisions, we find the case inapplicable.
We conclude that the shut-in well in the voluntary unit with the accrual of obligatory lieu royalty constituted constructive production and preserved the lease beyond its primary term.
Because of this conclusion, we do not reach the alternative contention that the lease was maintained beyond its primary term on the 98 acre tract by the well in the Conservation unit. It thus becomes unnecessary for the Court to decide whether or not the formation of the voluntary unit divided the lease obligations.
For the reasons assigned, the judgment of the Court of Appeal is reversed, and the plaintiff’s suit is dismissed.
• It is further ordered, adjudged, and decreed that the plaintiff pay one-half of the court costs and that the defendants pay one-half thereof.
*93 HAMITER, J., dissents, being of the opinion that our original decree should be reinstated and made final.
HAMLIN, J., dissents with written reasons.

. The original plaintiff, J. Holbert Odom, died after the institution of this action, and his heirs were substituted as parties plaintiff. For convenience we refer to the substituted plaintiffs in the singular throughout this opinion.

. Delatte v. Woods, 232 La. 341, 94 So.2d 281; United Carbon Co. v. Interstate Natural Gas Co., 176 La. 929, 147 So. 37. See also Knight v. Blackwell Oil & Gas Co., 197 La. 237, 1 So.2d 89; Glassell v. Richardson Oil Co., 150 La. 993, 91 So. 431; Pothier v. Barber Laboratories, 227 La. 357, 79 So.2d 481.

. Lawson v. Martin Timber Company, 238 La. 467, 115 So.2d 821; Muse v. Metropoli tan Life Ins. Co., 193 La. 605, 192 So. 72, 125 A.L.R. 1075.

. See LSA-C.O. art. 2057; Risinger v. Arkansas-Louisiana Gas Co., 198 La. 101, 3 So.2d 289; 52 C.J.S. Landlord and Tenant § 511, p. 315; 32 Am.Jur., Landlord and Tenant, § 462, p. 378; 126 A.L.R. 565.