OVERTON, J.
These seven consolidated suits were instituted in 1922 for the purpose of annulling, avoiding, or declaring forfeited seven mineral leases granted in 1919 to the Columbia County Development Company. The leases were granted by the plaintiffs whose names appear as set forth above. Two of the plaintiffs, Julius T. and Huey P. Long, whose names do not appear above, have joined in the suits as the owners of a one-third of a seven-eighths undivided interest in and to the mineral rights in each tract of land upon which the leases involved herein were granted.
The grounds alleged for annulling or declaring that each lease has been forfeited are the same in each case, and are as follows:
(1) That there was no amount or thing of value paid for it.
(2) That, if plaintiffs are held bound by the consideration now appearing in each of said leases, which it is alleged was unlawfully inserted therein after the execution of each, then, notwithstanding, each is null for lesion beyond moiety.
(3) That no drilling operations were begun on the land on which the leases were granted within the time -stipulated, or even up to the filing of these suits, and that the quarterly rentals agreed to, for the purpose of continuing the leases in force, when drilling has not commenced within the time fixed, have not been paid.
(4) That each lease contains potestative conditions, and, moreover, was not even signed by the Columbia County Development Company.
(5) That the leases have expired.
Each lease contains the following stipulation, to wit:
“The parties of the second part (the lessees) further agree that, in case operations for either the drilling of a well for oil or gas is not commenced or prosecuted with due diligence within one year from this date, then this grant shall immediately become null and void as to both parties, provided that second parties may prevent such forfeiture from quarter to quarter for three years by paying to the first party the Slim of 25 cents per year until such well is commenced. And it is agreed that the completion of such well shall be and operate as a full liquidation of all rent under this provision during the remainder of the term of this lease.”
When the leases were executed and delivered, and their execution proved before a notary, each one of them contained the recital that the lease was granted to the Columbia County Development Company in consideration of the payment of $1 and of the covenants and agreements contained in the lease. These covenants are those customarily contained in oil and gas leases for the payment of royalties to the lessors. However, after the execution and delivery of the leases, some one — it is not known who — altered the consideration of $1 recited in each lease by interlining a larger consideration, and in addition substituted as lessees for the Columbia County Development Company the names of others, though later erased their names and again inserted the name of the Columbia County Development Companyi as lessee, but left unchanged the consideration as altered.
For the sake of convenience, it is preferable, we think, first to dispose of the question as to whether the leases have been forfeited by failure to drill for oil or gas within the year following their execution, and by failure to pay the quarterly rentals stipulated *710 to keep them in force, in default of so drilling. That seems to be the chief question in the case, and the finding of facts necessary to determine it will aid materially in deciding some of the remaining questions.
It is not questioned by the Columbia County Development Company or by any of its assignees that a well veas not commenced within the year fixed on any of the tracts on which the leases attacked herein were granted. It is contended by that company', however, that long prior to the expiration of that year it paid to the lessors in stock the renewal rentals for the entire term of the leases, and thereby renewed the leases. Plaintiffs deny that such payments were made.
The leases were obtained at and as a result of public meetings held by W. D. Wing-field, the representative of the Columbia County Development Company. Wingfield testifies that at these meetings he told those present that he was organizing a company in Arkansas to explore and develop lands for oil and gas; that he was taking leases for a periQd' of five years, and had 20,000 acres in Webster parish (presumably under lease); and that he would give stock in the company at the rate of $1 an acre for leases, which would include rentals for the entire period thereof. At another meeting, which was held apparently after the execution of the leases, and at 'which the stock, or most of it, was delivered, D. C. ’Stell, who assisted Wingfield thereat, testifies that the latter explained fully to those present that if they accepted the stock they would not receive the money rentals; that the stock was in lieu of those rentals; and that, if they did not care to accept it,- they would be paid the rentals as they matured. The evidence of Wingfield as to what occurred on that occasion is to the same effect.
At the meeting at which the stock was delivered all of the plaintiffs, who granted the leases involved herein, were present, with the exception of Pixley. All of them on that occasion, excepting Pixley and Fomby, signed receipts, identical in all respects save as to the amount, of which the following, signed by Edom Wallace, will serve as a sample:
“Receipt.
“Received of the South Arkansas Oil & Gas Company $75 in stock of said South Arkansas Oil & Gas Company in full payment of the amounts specified in an oil and gas lease executed by me on the 1st day of April, 1919, to Col. Co. Dev. Co. on 80 acres of land.
“It is understood that I accept said stock in full payment of all amounts provided for in said lease including the amounts specified for the privilege of renewing said lease from time to time, and that the acceptance of said stock is an acknowledgment by me that said lease with all the privileges incident thereto have been extended for the fuE time provided for renewals in said lease. It is further understood and agreed by me that I receive said stock upon the conditions that I shall not dispose of same at any price prior to January 1st, 1920, and the president and secretary of the South Arkansas Oil & Gas Company are hereby instructed, empowered and directed, should I attempt to dispose of said stock prior to said date, to refuse to transfer the stock upon the books of the corporation and to refuse to issue same to the transferee.”
Pixley and Fomby, as we have observed, did not sign receipts, and hence this distinguishing feature of their cases will be considered separately. They, with the remaining plaintiffs, who,granted “leases,” testified in these cases, with the exception of two, and it is admitted that, ha'd those two been present, their evidence would have been the same as those who did testify. The evidence of those testifying is to the effect that they were to receive $1 an 'acre ior the granting of the leases, and 25 cents a year, payable quarterly, for each acre of land leased, for the privilege of renewing the leases, in the event a well was not drilled as contemplated, and that the stock they received was in payment of the $1 an acre for the mere granting of the leases, and not for the rentals. *712 With respect to those of the plaintiffs who signed receipts, their evidence is to the effect that on the occasion of the meeting at which they signed, which was the same one at which the stock was delivered, the weather •was very threatening; that Wingfield called their attention to an approaching storm, and advised them that it would be best to hurry; that the business before the meeting, on that occasion, was conducted in a hurried manner; that Wingfield did not read a copy of the receipt signed by them in full; that in reading' a copy he omitted that part relative to rentals; that he did not advise them that the stock was in payment of rents; and that they did not know that the receipt so read until some months later, when in an effort to ascertain why they were not receiving the rentals, th'ey learned the cause.
On the other hand, Wingfield and Stell testify that a form of the receipt used was read in full to those present before the receipts were presented for signature, and Wingfield, the only one of the two who testified on the subject, says that, while the weather grew threatening towards the close of the meeting, yet the business before the meeting was not conducted with undue haste.
The evidence impresses us with the substantial correctness of Wingfield’s and Stell’s version. The receipts, with the exception of one, are in the record, in the original. They are in printed form, except as to the amount, the number of acres, and the name of the lessee. One of them may be read easily in a moment. Not only one, but a number, of these receipts were given out to be signed, and this at a public meeting.
It is almost incredible to think, under the above circumstances, that at least one of those to whom a receipt was handed did not read it before returning it with his signature, and if a fraud was about to be perpetrated did not reveal the fraud to the meeting. The mere reading of one of the receipts would have disclosed, in a moment, the attempted imposition, if imposition, there was. In fact, the chances of immediate detection were so great that it is most unlikely that any one with ordinary foresight would have attempted such a fraud in such a manner. Besides these observations, the recital of the consideration in the leases is entitled to weight. All of the witnesses in the case, who testify on the subject, agree that, when the leases were signed, the consideration recited was $1, excluding certain obligations to be discharged by the lessee under certain contingencies. If we adopt the version of those of the plaintiffs who have taken the witness stand, we at once come into conflict with that recital. Under the circumstances, we deem it more reasonable to adopt the version of Wingfield and Stell. In our view, their version is supported by the clear weight of the evidence; and, from the judgment rendered below, we infer that such must have been the conclusion of our brother of the lower court.
With respect to Pixley and Eomby, both received the stock issued to them, but neither, in person, signed the receipts relied on, in part, by the Columbia County Development Company and its assignees to show payment of the rents in full. Wingfield testifies that both authorized him to sign their names to the receipts. Each, however, denies that such authority was granted. The record, therefore, leaves it uncertain as to whether Wingfield was authorized to sign for them or not. Under such circumstances, we cannot say that he was, and hence we are unable to hold that these receipts should be considered as evidence against Fomby and Pixley.
Fomby, however, was present at the meeting at which the stock was issued, and at which the purpose of its issuance was explained, though he did not receive his then, but later. Hence, it must be held that he *714 received Ms stock with full knowledge of why it was delivered to him, and, having so accepted it, it should be held that he received the stock in full payment of the rents, under the lease granted by him.
Pixley was not present at the meeting at which the stock was issued, and therefore we are unable to say with any degree of legal certainty that he accepted the stock issued him with knowledge of why it was so issued, and hence we are unable to say that he accepted it in payment of the rents called for by the contract. In fact, when Pixley discovered that the stock had been delivered to him in settlement of the rents, he repudiated the transaction, and offered to return the stock, but his offer was declined.
Therefore, as no well was commenced or drilled on the land leased by Pixley' within the year fixed by the contract, and as the stipulated sum of 25 cents per acre per year was not paid quarterly, and as notMng appears to have been accepted in lieu thereof, it follows that Pixley’s lease, under its terms, was forfeited.
The above ruling disposes of Pixley’s case. Since, however, we have held that the remaining lessors received the stock in full settlement of the rentals stipulated in their leases, and hence that there has been no forfeiture of the rights, granted by them, it is necessary, because of that ruling, to consider the other grounds of attack, which those lessors have urged.
The first of these grounds to be considered is that the leases contain potestative conditions, in that their fulfillment and execution depend upon events and things entirely within the power of the Columbia County Development Company, or its assigns, to bring about, and that the leases do not require the company to do or not to do a thing. In connection with this ground, we may also consider the additional one that nothing of value was paid for the granting of the rights which those instruments purport to grant.
The leases do not bind the Columbia County Development Company to drill for oil or gas. They do not bind the- company to pay rentals or to pay anything, except the $1 consideration mentioned in them, unless the company,, at its option, should drill for oil and gas, and should be successful in its effort, when it then would be under obligation to pay the royalties stipulated. As the company was not bound to drill for oil or gas, and as the consideration of $1, recited in each of the leases, is, under our law, no consideration at all, in view of the faqt that it bears no proportion, within reason, to the value of the rights granted, we entertain no doubt that the leases, when first executed, could have been annulled. However, shortly after their execution the situation was changed, for, as we have found, the Columbia County Development Company offered to pay, and each of the lessors accepted, a settlement for all rentals that the company was permitted to pay, under the contracts, to extend the time for drilling. From the moment those payments were made, there stood in place of the contracts granting or purporting to grant to the Columbia County Development Company the right to drill for one year, for the consideration, in each instance, of $1, contracts granting to that company, for considerations ranging from approximately 90 cents to a dollar an acre, the right to drill for a period of four years, consisting of the first year mentioned in the contracts and the three years for which the contracts could be extended, under their terms, by the payment of rentals. These payments did not effect merely a part of each of the contracts, but each one of them in its entirety. In fact, as the payment of rentals was made, in each instance, very shortly after the contracts were executed, and long, before the expiration of the first year, it wras the manifest intention of th'e parties to them that the payment in each instance, from the moment of its acceptance, should have its logical effect of *716 converting the contract under which it was made from a one-year contract, granted for $1 to a contract granting the right to drill for four years in consideration of the payment of the rentals plus the $1 originally paid.
The first question that presents itself for consideration, under the contracts in their changed condition — a condition due to the payment and acceptance of the rentals, which it was optional with the lessee to make — is: Are the contracts that resulted valid and binding as against the lessors herein, except Pixley, whose case has been determined upon other grounds. In passing upon this question, it must be observed that, notwithstanding the changed condition of the contracts, it still remains optional with the lessee to drill or not as it deems proper. However, should the contracts be annulled for that reason? We think not. In Saunders v. Busch-Everett Co., 138 La. 1049, 71 South. 153, to quote from the syllabus, which correctly expresses the law of the case, it was held:
“A contract whereby the owner of land grants to another, in consideration of payments, made and to be made, of certain agreed sums of money and other considerations which are to arise in a certain contingency, his right, or option, to drill for oil or gas within a year, and to'extend the time thus granted, quarterly quarter, until it reaches a limit of five years, contains no potestative condition by reason of its failure to impose upon the grantee any obligation to drill, since it is not within the contemplation of the contract that he should drill, unless he so elects. The purpose is to confer the right to drill without imposing the obligation, and there is nothing in that purpose or in the nature of the contract which contravenes any láw of this state.”
In the Saunders Case the contract was in the form of a sale, conveying, in effect, the right to explore for oil and gas on certain described land for one year, and conferred the right on the grantee to renew the contract from quarter to quarter, after the expiration of the year, for a specified time, by paying for each quarter a fixed sum, in the event a well should not be drilled within the year, or within the quarter, but left it optional with the grantee whether to drill or not. In the cases at bar a similar right was conveyed or granted, though in the form of a lease instead of that of a sale. That difference, however, with respect to the contracts in this and the Saunders Case, is rather one of form than of substance. In both the right to explore for oil and gas for a limited time was granted. In both, in the event of a failure to drill, or to begin drilling within the year following the execution of the contracts, the grantees were permitted to prevent a forfeiture, or, in other words, to renew the contracts, from quarter to quarter, for a limited time, by paying specified sums. In the Saunders Case, in the event a well should be drilled, and the effort should meet with success; then the grantee became bound, and in the cases at bar the lessee becomes bound, to pay certain royalties to their respective léssors or grantors. Therefore, after the 'payment of the rentals, which we have held affected the contracts, in the cases at bar, in their entirety, those contracts became not unlike the contract in the Saunders Case, in the nature of the right accorded the lessee or grantee. They, then, like the contracts in the Saunders Case, granted the right to drill for oil and gas for a limited time, that is, four years, for a consideration paid, leaving it optional with the lessee or grantee whether to drill or not. In the Saunders Case, as we have seen, it was held that merely because the contract left it optional with the grantee to drill or not did not make the contract null as containing a potestative condition. In fact, there is no reason why, if a person wishes to grant another the optional right to explore for oil or gas on his land, he may not do so. There is nothing in granting such a right that is opposed to *718 law. True, a contract granting it must be supported by a serious consideration, and by one which is not so far below the value of the right granted as to be out of all proportion with its value. In the cases at bar, from our reading of the contract, it was- the intention of the lessors, as in the Saunders Case, to grant to the lessee the right to drill at the latter’s option. The right granted (was perfectly valid, provided, of course, the granting of it is supported by a serious consideration, and by one that is not so far below the value of the right as to be out of all proportion with it.
In our opinion, after the lessors in the present cases accepted the stock in full settlement of the rents, and thereby converted, as it were, the contracts from those granting the right to explore for oil and gas for one year for considerations of $1 to those granting the same right for four years for considerations ranging from 90 cents to $1 an acre, there were considerations sufficient to support the contracts. The lands that were leased are in what is known as wildcat territory. Their exact value does not appear in the record, but we gather from the evidence that they are ordinary pine hill lands, and therefore, at the time they were leased-, were not of very great value. In the Sounders Case, cited and discussed supra, it was held that for a similar right a consideration of approximately 8 per cent, per annum was sufficient. By the same standard, we infer that the considerations here paid are sufficient. Moreover, in the absence of evidence showing the contrary, the presumption is that the considerations are sufficient, since every contract is presumed to be based upon a sufficient consideration.
Counsel, however, contend that the stock given in payment was worthless. The only evidence that we'find in the record with respect to its value, at the time it was given in payment, is that it was worth dollar for dollar when it was thus given. True, one of the lessors testifies that he endeavored to sell his, and was offered nothing for it, but this we gather from the record was sofne time after the stock was given in payment. It does not follow from that fact that the stock was not worth par when it was delivered and accepted in settlement of the rentals. The evidence, does not justify us in holding that the stock was not worth par at the time it was given in páyment, at which value it was accepted by the lessors.
Plaintiffs, as we have seen, have also attacked the leases as null on the ground of lesion beyond moiety. This attack is made only in the event it should be held that the amount of the consideration appearing in each lease has not been altered. As we have found that the consideration has been altered by some unknown person since the execution of the leases, perhaps, strictly speaking, this ground of attack, because of that finding, passes out of the case. On the other hand, however, we have held that the payment of the rentals furnishes a sufficient consideration for the contracts to rest upon, and therefore plaintiffs are virtuallyi in the same position as if it had been held that the consideration now appearing in each of the leases had not been altered, but appeared there at the time of their execution. Hence, we shall view the ground of attack as if it were not made dependent upon any particular finding of fact, and pass upon it. We think, however, that this ground is without merit. A mineral lease is not one of those contracts which may be annulled for lesion beyond moiety when granted by persons who have attained their majority, and who are not incapacitated. Civil Code, arts, 1861 and 1863.
It is also contended, as we have observed, that the leases were not signed by the lessee, and are therefore invalid; and, in the event they are recognized as valid, then that they have expired.
*720 With respect to the first ground, it may be said that, while it is true the leases were not signed by the lessee, yet it is clear that the lessee paid the rentals, and thereby, if not before then, showed its acceptance of the contracts; and, as the lessee later 'transferred the leases, it again, by doing so, showed its acceptance of them. The acceptance in either manner is sufficient. With respect to the second ground, it may be said that when these suits were filed the leases still had some time within which to run. By filing and prosecuting these suits, plaintiffs have made it utterly impracticable for the assignees of the lessee to exercise the rights granted by the leases. Having made it thus impracticable by their own acts, plaintiffs are not in position to contend that the leases have expired. The period of this litigation should not be included in determining when the leases expire. Gulf Refining Co. v. Hayne, 148 La. 340, 86 South. 891; Standard Oil Co. v. Webb, 149 La. 245, 98 South. 808.
Messrs. Julius T. and Huey P. Long, the two plaintiffs who were not parties to the granting of the leases in controversy, but who are nevertheless interested in annulling them, or in having them declared forfeited, contend that they occupy the position of third persons purchasing on the faith of the public records, and that, as it appears from these records that the leases are null, and) if not null, that they have been forfeited, there should be no question as to their right to annul them, or to have them declared forfeited. Their interest is evidenced by deeds executed about two years after the leases were granted, conveying to them an undivided interest in and to the mineral rights in the property. The conveyances were made to them for services to be rendered, as attorneys, in prosecuting these suits. Under the circumstances, in our opinion, the Longs do not occupy the position contended for, having acquired the interest claimed by them in settlement of their fees, and their cause must follow, therefore, the fate of that of their clients.
In closing, we may say that counsel for plaintiffs take the position that the case of Braswell v. Columbia County Development Co., 153 La. 691, 96 South. 534, is decisive of many of the points at issue herein. However, we think that on the facts the present cases may be readily differentiated from the Braswell Case.
For the foregoing reasons, we are of the opinion that the judgments appealed from are correct.
We may add that, since the defendants have lost the Pixley Case on appeal as well as in the lower court, they should be condemned to pay a part of the costs of appeal.
For the reasons assigned, it is ordered, adjudged, and decreed that the judgments appealed from be affirmed, the costs of appeal to be borne as follows: Six-sevenths by plaintiffs and one-seventh by defendants.
Rehearing denied by Division B, composed of DAWKINS, LAND, and LECHE, JJ.