**C. B. PENNINGTON, Plaintiff,**

v.

**COLONIAL PIPELINE COMPANY, Defendant.**

**Civ. A. No. 2847.**

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Nov. 18, 1966.

Victor A. Sachse, Bert K. Robinson, Breazeale, Sachse & Wilson, Baton Rouge, La., for plaintiff.

R. Gordon Kean, Jr., Sanders, Miller, Downing, Rubin & Kean, Baton Rouge, La., for defendant.

WEST, District Judge:

This case arises out of a dispute between the alleged owner of an oil, gas and mineral lease covering 2,425 acres of land, and the owner of the fee title to 29 acres of the same land. Plaintiff, C. B. Pennington, claims to have ac-quired, among other things, the exclusive right to "investigate, explore and drill" for oil and gas on the 2,425 acres of land, including the 29 acres now owned by defendant Colonial Pipeline Company, by virtue of an oil, gas and mineral lease allegedly entered into on July 16, 1956, between him as lessee, and the then owner of the entire 2,425 acres, one T. L. Mills, Jr., as lessor. Subsequent to July 16, 1956, Colonial purchased from Mills a pipeline right of way, or servitude, across a portion of the Mills property on which it has since laid a 36 inch pipeline for the transmission of refined petroleum products, and on July 26, 1962, it also purchased from Mills the fee title to 29 acres of the property on which it ultimately erected certain pumping and storage facilities used in connection with its pipeline operations.

Pennington now wishes to conduct certain geophysical explorations on and under the property involved, including the 29 acres now owned by Colonial, and it is his position that because of the fact that his alleged oil and gas lease pre-dates the acquisition of the 29 acres by Colonial, his rights are " * * * prior in time and superior in law to the subsequently acquired rights of Colonial * * *." Thus it is Pennington's contention that since he plans to locate certain seismic shotpoints on Colonial's 29 acres, and that since, in his opinion, the location of these shotpoints on that property is essential to his obtaining reliable seismic information concerning the subsurface of the property, and since the location and operation of Colonial's facilities on this property will interfere with his plan, Colonial must be ordered to shut down all operations on the property, drain all lines crossing the property, drain all storage tanks in the area, shut down all electrical service to the property, and if necessary, remove any structures that might interfere with the successful completion of his seismic survey of the property. Colonial, on the other hand, contends first that Pennington's alleged mineral lease is actually no lease at all because it was never

signed by him as lessee, and secondly, that even if the lease is valid, the fact that it predates the date of Colonial's acquisition of title to the property does not make the rights of the lessee superior in law to those of the landowner. It is Colonial's contention that if a valid mineral lease exists, the rights of the lessee under the lease and the rights of the land owner must exist together and be exercised by each in such a manner as not to unreasonably interfere with the rights of the other. It is Colonial's further contention that if, in fact, Pennington has a valid oil and gas lease, his proposed plan for geophysical exploration of the leased property is unnecessary for a proper exercise of his lease rights, and amounts to an unreasonable interference with the exercise by Colonial of its rights as owner of the 29 acre tract.

As set forth in the pre-trial order, entered in the record of this case, the pertinent contested issues of fact are delineated as follows:

"(a) Whether defendant's installation will interfere with the reasonable mineral exploration and development of the property:

"(1) from the standpoint of effective seismic operations,

"(i) because of interference by noise,

(ii) because of interference by vibrations, and

(iii) because of interference by electric current to prevent electrolysis of the pipeline; and

"(2) From the standpoint of safe seismic operations."

And, as further set forth in the pretrial order, the pertinent contested issues of law are declared to be:

"(a) Whether the lease is valid though the lessee did not sign it.

"(b) Whether the mineral lessee, whose lease was of record before acquisition of the defendant, has legal priority to reasonably utilize his lease, and

"(c) Whether, as a matter of law, Colonial's installations unreasonably interfere with any of Pennington's rights under the alleged mineral lease."

The remaining issues enumerated in the pre-trial order pertaining to the question of whether or not Colonial, as a common carrier, has a right of expropriation need not be discussed here as such a determination is not necessary to a proper disposition of this case.

During the course of this trial much expert testimony was heard by the Court concerning the feasibility, necessity, and reasonableness of the Pennington plan for geophysical survey of his lease, and much expert testimony was heard concerning the question of whether or not Colonial's facilities and operations would unreasonably interfere with a reasonable exercise of Pennington's rights under his alleged mineral lease. After seeing and hearing the evidence in this case, it is the opinion of this Court that to permit the plaintiff to carry out his plan of exploration precisely as outlined by him, and to require the defendant to shut down its operations, drain its pipelines and empty its tanks to permit him to do so, would constitute an unnecessary and unreasonable interference with the rights of the defendant as owner of the 29 acres of land involved. In compliance with Rule 52 of the Federal Rules of Civil Procedure the Court now makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. On July 16, 1956, an oil, gas and mineral lease was signed by T. L. Mills, Jr., as lessor, covering 2,425 acre of land owned by Mills and situated in East Feliciana Parish, Louisiana. The named lessee in this instrument was plaintiff herein, C. B. Pennington. The signature of the lessor, T. L. Mills, Jr., was witnessed by two witnesses, including one C. B. Pennington, Jr., but the named lessee, C. B. Pennington, did not sign the lease.

2. This purported lease, signed only by the lessor Mills, and two witnesses, was recorded in the office of the Clerk and Recorder for the Parish of East Feliciana, Louisiana, on July 19, 1960.

3. The primary term of this lease was ten years, and since its inception plaintiff has paid the annual rental payments therein provided for.

4. On June 29, 1962, defendant Colonial acquired from the same T. L. Mills, Jr. a right-of-way for a pipeline to be laid across a portion of the 2,425 acre tract, and on July 26, 1962, Colonial acquired from Mills the fee title to approximately 29 acres of this tract upon which it intended to, and did, erect certain pumping and storage facilities to be used in connection with the operation of its pipeline.

5. At the time Colonial purchased the 29 acres from Mills, it was stated in the deed that "The above property is subject to an oil, gas and mineral lease dated July 16, 1956. This reference is not to be construed as an acknowledgment of said lease but is merely for the purpose of calling its existence to the attention of vendee." Upon learning of Colonial's purchase from Mills, Pennington immediately notified Colonial of his purported lease, and on December 28, 1962, Colonial replied that "At the time we acquired the twenty-nine (29) acres from Thomas L. Mills, Jr., we were aware there was such an incumbrance on this property. However, we do not believe our construction on this property will interfere with your plans."

6. As early as July 26, 1962, the date of their purchase of the 29 acres, Colonial knew of the existence of what Pennington claimed to be a valid oil, gas and mineral lease, and from that time until August of 1963, there was apparently no effort made by Colonial to question or contest the validity of this lease. On the contrary, by their letter to Pennington of December 28, 1962, Colonial, in effect, acknowledged the existence of the lease. It was not until August of 1963, after the apparent breakdown of negotiations pertaining to the manner in which Pennington would exercise his alleged rights under the lease without unduly interfering with Colonial's rights as landowner, and after Colonial was threatened with this law suit by Pennington, that Colonial first questioned the validity of the lease.

7. After Colonial acquired the right-of-way in June of 1962, and the title to the 29 acres in July of 1962, it proceeded to install a 36 inch pipeline along the right-of-way and to construct the pumping and storage facilities on the 29 acre site. This construction was not complete and the pipeline across this property was not placed in operation until October of 1963.

8. Between July, 1962 and October, 1963 there was nothing to have prevented Pennington from conducting seismic operations on and under this property. In December, 1962, he was advised that Colonial did not expect to have its pipeline in operation until August of 1963, and he was later advised that it would not be in operation until October, 1963. Despite his contention now that he was unaware of the precise location of the Colonial facilities, the Court finds as a fact that he could have ascertained the exact location of all of these facilities if he had really wanted to conduct his exploration on and under this land before the completion of the Colonial facilities. And had he done so, there was ample time between December, 1962 and the completion date of the Colonial facilities for him to have completed any and all seismic and geophysical surveys that he might have wanted to perform. He chose to wait until all of Colonial's facilities were constructed and in operation before finalizing his exploration plans. At various times between December, 1952, and the completion date of Colonial's facilities, the plaintiff was notified by the defendant that he, plaintiff, could proceed to conduct his seismic operations, and defendant, on several occasions, requested plaintiff to arrange a conference between Pennington's geologists and Colonial's geologists so that a reasonable plan of exploration could

be agreed upon in order that neither the leaseholder nor the landowner would unreasonably interfere with the rights of each other.

9. In June of 1963, at a time when the construction of Colonial's installation was well advanced, Pennington advised Colonial that his plan for geophysical survey of his lease called for 36 seismic shotpoints to be located on the 2,425 acre lease, and that nine of them, or one-fourth of the total, would be located precisely on Colonial's 29 acre tract.

10. Some of the nine shotpoints to be located on Colonial's property according to Pennington's plan would, if left in their proposed location, very likely interfere with Colonial's facilities and operations.

11. Colonial's 36 inch pipeline crossing this property runs in interstate commerce from Pasadena, Texas to Linden, New Jersey. It carries 61 grades of refined petroleum products; is regulated by the Interstate Commerce Commission; and delivers petroleum products to 177 intermediate points between Pasadena, Texas and Linden, New Jersey. Normally the amount of petroleum products shipped through this line varies from a low of 530,000 barrels per day to a maximum of 825,000 barrels per day, and to completely shut down this operation for a one day period would amount to a loss of revenue to Colonial of approximately $196,000.

12. To allow the Pennington plan to be carried out unaltered would result in an unwarranted, unnecessary and unreasonable interference with the rights of Colonial as the owner of the fee title to the 29 acre tract.

13. The Court finds, as a fact, that plaintiff has not, in legal good faith, endeavored to pursue his lease rights in such a manner as not to unduly and unreasonably interfere with the rights of the defendant landowner.

14. It is not necessary in order to completely, adequately, and reliably evaluate the subsurface of Pennington's lease to locate any shotpoints whatsoever on the Colonial property, but even if some shotpoints located on the property are desired, they can easily and satisfactorily be relocated so as to create no danger or hazard to the Colonial facilities, and at the same time provide adequate and acceptable data in connection with the geophysical survey of this lease. Defendant has shown, by a preponderance of the evidence that, in this case, if shotpoints are located not less than one hundred fifty (150) feet from any of Colonial's physical facilities it would be reasonable to assume that the detonations required for a seismic survey can be made without danger to Colonial's facilities and that reliable information can be gathered from such a survey.

15. There is absolutely no need whatsoever for Colonial to drain their storage tanks, drain their pipeline, or even stop completely the flow of fluid through the pipeline in order for Pennington to carry out a reasonable and adequate geophysical survey of his lease whether some of the shotpoints are located directly on the 29 acre tract or not. Such a survey can be planned and carried out by relocation of shotpoints wherever necessary to points either on or off of the Colonial property so that no undue interference or danger will be encountered from Colonial's operations. Such relocation of shotpoints will not materially affect the reliability of the information obtained from the survey.

16. Even though the evidence clearly shows that it is quite unnecessary for plaintiff to locate any shotpoints on Colonial's property in order to adequately explore his lease, nevertheless he does have the right under his lease to do so as long as he does not unreasonably interfere with Colonial's use of its property. Should plaintiff elect to locate some of his shotpoints on this property in accordance with this Court's findings, the only anticipated interference with his survey might come from noise generated by Colonial's pumps and from the electrical impulses emanating from their rectifiers.

17. Even though this interference could probably be adequately filtered out by the use of proper filters, nevertheless, the evidence does preponderate to the effect that if shotpoints were, in fact, located on Colonial's property, and in close proximity to Colonial's facilities, more satisfactory results would be obtained if, at the moment the dynamite was actually detonated in the shotpoint holes, the pumps were shut down and the electric current cut off. At no other time would it be necessary to effect such shutdowns of pumps and electrical current, and at no time would it be necessary to actually stop the flow of fluid through the pipeline or to drain any of the storage tanks.

18. Upon receiving notice at least thirty (30) days in advance of the time the seismic shots are to be actually detonated on Colonial's property, Colonial could, without unreasonable interference with the use of their property, cause the pumps and electricity to be shut down for the time required to make these test shots.

19. The actual time required for detonating each shot is only a matter of seconds, and it is only during this time that a shutdown of the pumps and electricity would be required. But if Colonial, for technical reasons, might prefer to shut down the pumps and electricity during the entire time that the shotpoints on their property were being prepared and used, the Court finds, as a fact, that even if all nine shotpoints were relocated but remained on Colonial's property, the entire time that could reasonably be required to survey, drill, shoot, and record all nine shots would be only two days.

20. Plaintiff could reasonably and successfully survey his entire lease without actually locating any shotpoints on Colonial's property, but he could also reasonably elect to place some shotpoints on Colonial's property, so located as to not unreasonably interfere with Colonial's operation. At the same time, Colonial could reasonably elect, if shotpoints are placed on its property, to either shut down its pumps and electric current only during the time of actual making the test shots, or shut them down for the two days required to survey, drill, shoot, and record all nine shotpoints presently planned by Pennington to be located on the Colonial property.

21. Plaintiff has completely failed to carry the burden of proving that his proposed plan to conduct a geophysical survey of his lease does not unreasonably interfere with the exercise of the rights of the landowner, Colonial, and on the other hand, Colonial has quite adequately and by a clear preponderance of the evidence carried the burden of proving that the Pennington plan does, in fact, unreasonably interfere with their right to the peaceable possession and use of their property and that alternate plans are available to plaintiff whereby he may reasonably explore for oil, gas or other minerals under the leased property without unreasonably interfering with Colonial's operations.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter, and venue is properly laid in the Eastern District of Louisiana, Baton Rouge Division. 28 U.S.C.A. § 1332.

2. The oil, gas and mineral lease held by Pennington on the 2,425 acres of land was not a valid lease when executed by the purported lessor, Mills, because of the fact that it was never signed by Pennington. But a lease may be accepted by the lessee and thus become an effective lease by means other than being signed by the lessee. In this case, the lease as between Pennington and Mills did become an effective lease because Pennington, by making lease payments, and by asserting his ownership of the lease signified his acceptance thereof, and because the lessor Mills, in accepting rental payments from Pennington, is estopped to deny the validity of the lease. Lieber v. Ouachita Natural Gas and Oil Co., 153 La. 159, 95 So. 538 (1922); Fomby v. Columbia County De-

velopment Co., 155 La. 705, 99 So. 537 (1924).

3. Under the well settled law of Louisiana, third persons, such as Colonial in this instance, dealing with immovable property, may rely on the face of the public records and need not go beyond or behind those records in ascertaining the validity of the title they seek to acquire. McDuffie v. Walker, 125 La. 152, 51 So. 100 (1910); Jackson v. Golson, 91 So.2d 394 (La.App., 2nd Cir. 1956); Braswell v. Columbia County Development Co., 153 La. 691, 96 So. 534 (1923); Fomby v. Columbia County Development Co., supra. But the owner of the fee title to land purchased by him after it has become encumbered by an effective lease may, by his actions, be estopped to deny the validity of the lease.

5. The Court finds, as a matter of law, that in this case, Colonial, by its acknowledgment of the existence of what purported to be an oil and gas lease in favor of Mr. Pennington at the time of acquiring title to the 29 acre tract in July of 1962, and by its specific acknowledgment to Pennington of the existence of this lease in its letter to him of December 28, 1962, and by its actions between December, 1962 and August, 1963 in allowing plaintiff to attempt to pursue his lease rights without contesting his right to do so, is now estopped to deny the validity of the lease.

6. The rights of Pennington as the holder of a mineral lease, and the rights of Colonial as the owner of the fee title to the land are correlative rights, neither being superior to nor inferior to the other, and the rights of each party can only be exercised in such a manner as not to unreasonably interfere with the rights of the other. Standard Oil Co. of La. v. Kinnebrew et al., 155 La. 1009, 99 So. 802 (1924); Smith v. Schuster, 66 So.2d 430 (La.App., 2nd Cir. 1953).

7. The Court further finds, as a matter of law, that to allow plaintiff to carry out his proposed exploration of this lease, as outlined by him, would constitute an undue, unnecessary, and unreasonable interference with the right of Colonial to the reasonable use of their property, and that to require the plaintiff to so alter his plan of exploration as to avoid an unreasonable interference with Colonial's use of their property would not in any way deprive or unreasonably interfere with the right of plaintiff to exercise all rights granted him under his oil, gas and mineral lease.

8. The Court further finds, as a matter of law, that while it is actually unnecessary for plaintiff, in exercising his lease rights, to place any shotpoints whatsoever on Colonial's property, nevertheless he does have the right to do so if he wishes, so long as all shotpoints placed on the property are so located, as hereinbefore set forth in the Court's Findings of Fact, as not to unreasonably interfere with or endanger Colonial's facilities or operations. Judgment will be entered accordingly.