**PORT ARTHUR TOWING COMPANY**

v.

**OWENS–ILLINOIS, INC.**

Civ. A. No. 16984.

United States District Court,
W. D. Louisiana,
Lake Charles Division.

Dec. 21, 1972.

**394**

Anderson, Leithead, Scott, Boudreau, & Savoy, Lake Charles, La., for plaintiff.

Stockwell, St. Dizier, Sievert & Viccellio, Lake Charles, La., for defendant.

EDWIN F. HUNTER, Jr., District Judge:

Port Arthur Towing Company (PAT-CO), having acquired the rights emanating from a lease contract of October, 1953, brings this action against Owens-Illinois (the owner of the land), seeking a declaratory judgment that the lease is now in full force and effect. The land affected comprises 20 acres fronting on the Calcasieu River. It was vacant and unimproved in 1953, but the original lessee constructed a valuable shipyard facility upon it, which was contemplated by the terms of the original contract.

Defendant purchased the fee title to the acreage in 1966 and now insists that the lease has terminated, and asserts a counterclaim for all rent due since October 19, 1966—the date (it argues) of the dissolution.

This controversy results from a lengthy and complicated series of transactions. Analysis of the evidence leads us to the conclusion that the lease is alive and binding on Owens-Illinois, Inc. In support of this conclusion, and pursuant to Rule 52, F.R.Civ.P., the following findings are entered:

FINDINGS OF FACT

1. The original agreement was executed on October 19, 1953, by Stanford L. Walters and Mrs. Mary P. Leveque as lessors, and Calcasieu Shipbuilding Corporation as lessee. It was recorded in the Conveyance Records of Calcasieu Parish on October 29, 1953.

The portions which affect this litigation read:

1. This lease shall be for a total term of ten years from the date hereof and for a valuable consideration * * * the Lessor hereby grants to Lessee the option to renew this lease for five additional periods of ten years each beginning at the expiration of the first total term of ten years under the same terms and conditions and for the same rent as agreed to herein for the first ten years, provided Lessee shall give to Lessor written notice at least thirty days prior to the expiration of each ten-year period of its decision to exercise its said option to renew this lease for each additional ten-year period * * *.

2. The rent to be paid is $2,400 per year payable on or before October 19th of each year.

3. If the lessor decides to sell the land and receives a legitimate offer from some financially responsible third party, then lessee will be given the option to buy the land for the consideration offered at any time within thirty days of receipt of notice.

4. Lessee is specifically granted the right to sublet or sublease or as-

sign the lease and any and all rights hereby granted in whole or in part. In the event, however, that Lessee sublets or subleases the subject property, or any part thereof, for more than $2,400.00 per year, then Lessor will receive one-half of any said amount or amounts over $2,400.00.

This lease specifically, but not by way of limitation, shall be binding upon any persons or persons, actual, fictitious, and/or legal entities who may succeed to or acquire any of the rights of liabilities of the parties hereto.

2. Calcasieu Shipbuilding Corporation was ultimately adjudged a bankrupt. The lease was assigned by the Trustee in Bankruptcy to Calship, Inc., on October 15, 1958. This assignment was recorded December 18, 1958. Subsequently, Calship, Inc. was adjudged a bankrupt and the Bankruptcy Trustee executed an instrument which transferred "fee title" to the premises in question to the plaintiff. This transfer was executed on April 22, 1963, but was not recorded until October 31, 1966. The "fee title" instrument by the Trustee to PATCO was later corrected to reflect a transfer of the lease rather than "fee". This occurred on February 12, 1968, pursuant to a deed which was recorded on November 7, 1969.

3. Mrs. Mary Leveque was recognized in a Judgment of Possession recorded February 23, 1960, as sole legatee of Stanford L. Walters. As of that date, she was the sole lessor.

4. On August 20, 1963, Captain Fredeman, President of PATCO, gave written notice to Mary Leveque that PATCO was exercising its option to review the lease for an additional ten years. The renewal was timely and payment for the first year of the renewal term was accepted by Mrs. Leveque.

The letter was written on stationery with a PATCO letterhead, and Captain Fredeman was surely acting on behalf of PATCO.[1]

5. On January 1, 1964, PATCO subleased the land and equipment to Fredeman's Calcasieu Lock Shipyard, Inc., for a five year term. The lease provided for a monthly rental of $1,000.00. It was recorded October 31, 1966, and expired on December 31, 1968.

6. Later in 1964, Mrs. Mary P. Leveque died. Her heirs were placed in possession. PATCO paid the rent for the year beginning October 19, 1964 to the executrix, who accepted for the estate.

7. On November 19, 1964, an agent for the Leveque heirs sent notice to Fredeman's Calcasieu Lock Shipyard, Inc., that it was being given the right to exercise its purchase option under the lease. As heretofore noted, PATCO had sublet the land and equipment to its sister corporation, Fredeman's Calcasieu Lock Shipyard, Inc., but the option to purchase, if it existed, was in PATCO. Thereafter, a series of transactions began which resulted in PATCO's unsuccessful lawsuit for specific performance of its purchase option. PATCO v. Leveque, 247 So.2d 595 (La.App.). As a consequence of PATCO's failure to timely exercise its option, Owens-Illinois, Inc., ultimately acquired fee title to the lease property. Of relevance are the following chronological facts:

a. December 17–24, 1964—Option to purchase the property was granted to Maison, Inc., by the Leveque heirs, and subsequently assigned to Landtex, Inc., and then to the Pauley Agency, respectively.

b. April 5, 1965—These three transactions were filed for recordation.

---

1. Mary Leveque, for some obscure reason, executed an instrument on November 4, 1963, which was subsequently recorded on November 12, 1963. In it she consented to the substitution of Fredeman's Calcasieu Locks Shipyard, Inc., as lessee, in place of Calcasieu Shipbuilding Corporation. William F. Fredeman and his family owned all of the stock outstanding in both PATCO and Fredeman's Calcasieu Lock Shipyard, Inc.

**396**

c. December 17, 1965—The Pauley Agency notified Landtex of its decision to exercise the option.

d. February 11, 1966—The Pauley Agency assigned all of its rights to Owens–Illinois, Inc.; assignment was filed of record on February 14, 1966.

e. March 1, 1966—Act of Sale of the 20 acres from Leveque heirs to Landtex, Inc.

f. March 2, 1966—Act of Sale from Landtex, Inc., to Owens-Illinois, Inc.

g. March 4, 1966—Deeds in (e) and (f) above were filed for record. The final sale to Owens-Illinois, Inc., contained the following language:

*It is understood that this property is affected by a lease from Stanford L. Walters, et al to Calcasieu Shipbuilding Corporation, dated October, 1953, and recorded in Conveyance Book 548, at page 135 of the Conveyance Records of Calcasieu Parish, as amended of record, and that Vendor sells and transfers all of its rights, title and interests in said lease, as amended, and Vendee assumes the obligations of the Lessor under the lease,* and it being the intention by this deed to include in this transfer all of the property covered by said lease. (Italics ours.)

8. By letter dated March 10, 1966, Owens-Illinois advised Fredeman's Calcasieu Shipyard, Inc., that they had purchased the property and that all future rentals under the lease were payable to Owens-Illinois, Inc. A copy of its letter was sent to PATCO.

9. A check and cover letter were mailed on October 14, 1966, to Owens-Illinois, Inc., by PATCO for the rent due. The check had terms in it which were described in the following language in an accompanying letter:

Your particular attention is invited to the wording on the face of the check ("Payment herein is made in accordance with the terms found on the reverse hereof.") and the terms spelled out on the backside of the check ("Payment of rental from October 19, 1966, to October 19, 1967 is made to payee named therein at request of such payee in the letter of Messrs. Stockwell, St. Dizier, Sivert (sic.) & Vicellio (sic.), dated March 10, 1966, addressed to Fredeman's Calcasieu Shipyard, Inc., which payment is made with full reservation of rights of Port Arthur Towing Company to set aside and have sold to it the property described in the Lease dated October 19, 1953 owned by Port Arthur Towing Company.")

10. On October 27, 1966, Owens-Illinois, Inc. returned the tender, explaining that PATCO was attempting to change the terms and conditions of the lease and to restrict payment. Defendant took the position that the lessee was in default, and so advised plaintiff. PATCO returned the previously tendered check on November 8, 1966. In the accompanying letter, PATCO insisted that the endorsement did not restrict the lease terms in any way. Owens-Illinois, Inc., again replied that plaintiff was in default, and in correspondence dated November 11, 1966, notified PATCO they would seek dissolution of the lease. The letter advised:

In accordance with the provisions of the lease and due to the fact that the Lessee in the above lease has failed to pay the rent before the due date, Lessor, Owens-Illinois, Inc., does hereby exercise its option to declare due and exigible all future unpaid installments *for the remainder of the present ten-year term.* (Italics ours.)

This is to advise that, unless the full amount of rent is paid by December 20, 1966, Lessor will seek a dissolution of the lease for failure to pay rent in accordance with the terms of the lease.

11. On December 13, 1966, notice was given Owens-Illinois, Inc., that PATCO intended to pay the amount due for accelerated rent. On December 14, 1966, PATCO advised that the accelerated rent had been deposited to the credit of Owens-Illinois, Inc., at a local bank.

This letter of that date also contained this statement:

> This payment is intended to satisfy your demand for the rent for the remainder of the present term of the lease, *but if the amount is not correct, you are requested to immediately advise us so that any necessary adjustment may be made prior to December 20, 1966.* (Italics ours.)

Owens-Illinois replied in a letter dated December 20, 1966 that the tender was not acceptable, and then considered the lease dissolved. Three bases for this position were stated:

> 1. PATCO had sublet the land and equipment to Fredeman's Calcasieu Shipyard, Inc. from January 1, 1964 to December 31, 1968 for an amount in excess of the annual rental. One-half of this amount, according to the original lease, should have also been included in the rental deposit.
>
> 2. PATCO tendered a "restrictive" payment of rent on October 14, 1966, not in accordance with the terms of the lease.
>
> 3. There was an improper exercise of the renewal when the primary term of the base expired in 1963.[2]

12. PATCO filed suit in state court on November 2, 1966, seeking specific performance of its purchase option under the lease. This suit was terminated adversely to PATCO; affirmed by the Court of Appeal of Louisiana, 247 So.2d 595; and writs refused by the Supreme Court of Louisiana, 249 So.2d 206.

The Third Circuit Court of Appeal affirmed on the following basis:

> Thus we see that the basis for the trial court's decision in the instant case was not that plaintiff's right to specific enforcement of defendants' "obligation" to sell the land to plaintiff was forfeited because defendants' "obligation" was "extinguished", (as plaintiff suggests) but rather, that because of plaintiff's failure to timely exercise the option, defendants' "obligation" *never came into existence* and, therefore, the rights which plaintiff is seeking to enforce do not exist, and a trial of this case would be unnecessary. 247 So.2d at 601. (Italics ours.)

## ISSUES

1. Did the documents of record as of the time Owens-Illinois acquired the property provide sufficient notice that the 1953 lease was in effect, or do the laws of registry require that assignments and renewals of long term leases be of record in order to affect subsequent purchasers of immovable property?

2. Assuming arguenda that the laws of registry apply to renewals of long term lease, is defendant estopped under the facts here present to assert "third party innocence"?

3. Did PATCO's failure to pay the full amount allegedly owed by defendants' calculations under PATCO's sublease to Fredeman's Calcasieu Lock Shipyards, Inc., have the effect of terminating the primary lease as of October 19, 1966?

4. Did PATCO's state court suit constitute a denial of its landlord's title, thereby terminating the lessor-lessee relationship between the parties?

For reasons explained below, we find that the answers in all instances are in the plaintiff's favor and therefore hold that the 1953 lease is still binding between the defendant as lessor and plaintiff as lessee.

## THE PUBLIC RECORDS DOCTRINE

We believe that the documents which were of record when Owens-Illinois purchased the property were as follows:

> 1. The original lease between Stanford L. Walters and Mary P. Leveque (lessors) and Calcasieu Shipbuilding Corporation (lessee), recorded October 29, 1953.

---

2. Owens-Illinois has systematically returned all further rental tenders made by PATCO.

2. The assignment of the lessee's rights to CALSHIP, Inc., recorded December 18, 1958.

3. A judgment of possession recorded February 23, 1960, recognizing Mary P. Leveque as sole legatee of Stanford L. Walters.

4. An instrument executed by Mary P. Leveque consenting to the substitution of Fredeman's Calcasieu Locks Shipyard, Inc., as lessee in place of Calcasieu Shipbuilding Corp., recorded November 12, 1963.

A recorded lease is an encumbrance, a burden upon the property that follows it into the hands of the purchaser. A vendee who takes real property by transfer pending a recorded lease takes it subject to the encumbrance and has no right to use it until the lease expires. This is so because the right to the use of the property has been alienated prior to his acquisition. La. Civil Code Article 2733. The case law of Louisiana is uniform to the effect that purchasers of immovable property are not bound by prior leases unless such leases have been recorded. Did the recordations here present suffice to give notice to defendant of the assignment of the lease? The laws of registry are deeply imbedded in Louisiana jurisprudence. McDuffie v. Walker, 125 La. 152, 51 So. 100 (1909). A purchaser dealing with immovable property need only look to the public records. If no adverse claims appear, he may take good title to the property, despite any actual knowledge of unrecorded claims. Quatre Parish Co. v. Beauregard Parish School Board, 220 La. 592, 57 So.2d 197 (1952).

A particularly significant corollary to the Louisiana law of recordation is that when there appears on the face of the record such language that should give notice to a potential purchaser that his title is not free from all prior burdens, he must make further inquiry outside the record. Speaking for the Court in Pittsburgh Plate Glass Co. v. Woodcock, 150 So.2d 660 (La.App.1963), Judge Hood concisely stated the rule:

It also is settled that all persons have constructive notice of the existence and contents of recorded instruments affecting immovable property, and that where an instrument contains language which fairly puts a purchaser on inquiry as to the title of the property which he intends to buy, and he does not avail himself of the means and facilities at hand to obtain knowledge of the true facts, he is to be considered as having bought at his own risk and peril. Id. at 663. See also Neblett v. Placid Oil Co., 257 So.2d 167 (La.App.1971); Wells v. Joseph, 234 La. 780, 101 So.2d 667 (1958); Arnold v. Sun Oil Co., 218 La. 50, 48 So.2d 369 (1950); Brown v. Johnson, 11 So.2d 713 (La.App.1942).

In the instant case, the original lease was filed for record on October 29, 1953. It was to run for ten years with the option to renew granted to the lessee for five additional periods of ten years each. The only condition affixed to the option was that timely notice be given in writing. Specifically granted to the lessee was the unlimited right to "sublet or sublease or assign" the lease in whole or in part, on the condition that lessor receive one-half of the portion of any rent collected over $2,400.00 per year. As the preceding language from *Woodcock* makes clear, it is not necessary that the purchaser actually know; it is enough that he had good reason to know. The conclusion is certain and unequivocal that when defendant purchased the property in 1966, a cursory examination would have revealed that (1) under the option clause lessee could potentially renew the lease until the year 2013; (2) that the lessee had an unrestricted right to assign; and (3) that the lease was in effect after the initial ten year term had expired. Given this set of significant facts, we hold that Owens-Illinois had constructive notice of these recorded instruments affecting the property and that the language of these documents fairly put them on notice that the property was potentially burdened with a currently effective lease. Owens-Illinois

was obligated to avail itself of the means and facilities at hand to obtain knowledge of the true facts.

■■ This diversity action requires the application of Louisiana substantive law. The Louisiana Supreme Court is the final interpreter of that law. But we have not found, nor have we been cited to any Louisiana case directly on point. Our duty is to seek adjudications on related factual cases.

In Hamilton Company v. Hughes, 141 So. 398 (La.App.1932), the lessor assigned the lessee's rental notes to a bank. The lease, which made no mention of assignment of rental payments, was recorded prior to the plaintiff's mortgage on the property. After the plaintiff foreclosed he brought suit to obtain the rental payments that fell due after the seizure of the property, since the proceeds from the sale did not fully compensate him for the debt which his mortgage secured. Plaintiff claimed that since the assignment of the rental notes was unrecorded, it could have no effect upon third parties. However, the Court ruled to the contrary, stating:

> We also think that so long as the contract was of record there was no necessity of placing of record the assignment of the notes. Because the contract of lease, in order to be effective against third persons, must be recorded, it does not necessarily mean that an assignment of the rentals or *rights under the lease* must be recorded. The rights under the contract, or the rents due or to become due thereunder, do not fall under the class with immovables, hence the laws of registry do not apply. Such rights are heritable, incorporeal, and, under Civ. Code, art. 2009, may be assigned, and we think, without necessity of registry of the assignment. (Emphasis ours), Id. at 400.

In Magnolia Petroleum v. Carter, 2 So.2d 680 (La.App.1941), a lease was signed with a five year renewal provision. At the end of the original term, the lessee timely indicated by letter to his lessor that he wished to renew. This lessor had directly contacted his lessee's sublessee and had negotiated a separate lease with him prior to the end of the first term of the initial lease. Having chosen to exercise his option to renew, the original lessee brought an action to evict his sublessee with whom he had terminated the sublease. Deciding the case in favor of the original lessee, the Court observed that:

> The stipulation in the lease granting to plaintiff the option of renewing it for another five-year period is a covenant running with the title. *Its registry provided constructive notice to all persons * * *.* When plaintiff advised Terrill, its lessor, that the option to renew was availed of by it, this action automatically brought about the renewal and continued the relation of landlord and tenant between them. (Emphasis ours.) Id. at 682.

■ We conclude as a matter of law that by filing the original lease which contained the renewal option and assignment provisions, the original parties to the lease fulfilled the requirements of La.R.S. 9:2721. Its registry provided constructive notice to all. The assignment and renewal did not create any additional burdens on the land. These were transactions clearly contemplated by, and in fulfillment of, the terms of the already-recorded lease. If anything, these written instruments primarily relate to and affect the lease itself and the parties thereto, not the immovable property.

Defendant relies upon Braswell v. Columbia County Development Co., 153 La. 691, 96 So. 534 (1923), and Baird v. Atlas Oil Co., 146 La. 1091, 84 So. 366 (1920). Those cases held that under "drill-or-pay" mineral leases, a holder of a second lease need only determine if the record holder of the first lease had made the payments necessary to keep it alive. They were impliedly overruled by Gulf Refining Co. v. Glassell, 186 La. 190, 171 So. 846 (1936). Arnold v.

Sun Oil Company, 218 La. 50, 48 So.2d 369 (1950).

Without specifically ruling on the re-vitalization of these cases, they are hardly supportive of defendant's posi-tion. The result reached in both *Baird* and *Braswell* was pegged on the peculiar relationship between the parties. In *Baird,* the court stated that:

> [T]he matter involved was not a mere question of indebtedness to be dis-charged, but of the exercise of a right of covenant in a deed, and for which substantial counter rights were to ac-crue, and hence the creditor had and has the right to expect and require that only the one to whom such rights are to flow shall be permitted to exer-cise the option which he had granted. Baird, supra, 84 So. at 370.

Citing *Baird,* the court, in *Braswell,* op-ined that "the right to exercise such op-tion is one of covenant and is restricted by the lessor under the recorded con-tract of lease solely to defendant compa-ny." These highly generic "drill-or-pay" mineral leases are glaringly dissimilar to the lease in the instant case, where the lessor specifically granted an unrestrict-ed renewal option as well as an unre-stricted right of assignment.

## ESTOPPEL

■■ The very text and language of several of the complicated transactions, and ultimately the deed to Owens-Illinois itself, reflect that not only did defendant acquire the land subject to the lease, but it also expressly acquired, undertook, ac-knowledged, and assumed all of the land-owner's rights, title and interest in and to the lease itself. By doing so it un-dertook the role as lessor and became a party to the contract itself. Upon tak-ing title, Owens-Illinois notified both Fredeman's and Patco that rental pay-ments were to be made to it as the new property owner. When PATCO submit-ted the rental check with a reservation of rights as to the option to purchase, Owens-Illinois rejected the tender, *not* because the lease was no longer in ef-fect, but because the payment was not made as per the terms of the lease. Fi-nally, by letter of November 11, 1966, defendant informed plaintiff's attorney that "in accordance with the provisions of the lease * * * Lessor Owens-Il-linois, Inc., has hereby exercised its op-tion to declare due and exigible all fu-ture unpaid installments for *the remain-der of the present ten year term.*" (Emphasis ours.)

At some point, a purchaser of real es-tate, acting as Owens-Illinois has acted, must lose his "third party innocence" and assume the obligations incurred by his vendor, even if he might not other-wise be so bound by law. In the case of Pennington v. Colonial Pipeline Co., 260 F.Supp. 643 (E.D.La., 1966), Colonial purchased property upon which an oil and gas lease had been executed by his vendor and the plaintiff-lessee, Penning-ton. Although the lease was recorded, the court found that it was not valid when executed because it had never been signed by Pennington. However, after reciting the McDuffie registry rule, the court enunciated the following conclu-sion:

> Colonial, by its acknowledgement of the existence of what purported to be an oil and gas lease in favor of Mr. Pennington at the time of acquiring title to the 29 acre tract in July of 1962, and by its specific acknowledge-ment to Pennington of the existence of this lease in its letter to him of De-cember 28, 1962, and by his actions between December, 1962 and August, 1963 in allowing plaintiff to attempt to pursue his lease rights without con-testing his right to do so, *is now es-topped to deny the validity of the lease.*" (Emphasis ours.) Id. at 649.

In reviewing the accumulation of Ow-ens-Illinois' actions on its purchase of the property, it becomes evident that Owens-Illinois conducted itself as lessor under a lease that it considered to be binding on itself and PATCO. After at-tempting to accelerate the rental due for the remainder of the ten year renewal term, it seems totally unrealistic for Ow-ens-Illinois to insist that it can only be

bound by a record that shows CAL-SHIP, Inc., as lessee. There can be no quarrel with the salutory purpose of the registry laws, but their application in this case stretches them beyond the breaking point. We conclude that Owens-Illinois' actions, as lessor under the lease, estop it from denying its vitality.

## ALLEGED FAILURE TO PAY FULL RENTAL

PATCO acquired the leasehold interest and the shipyard equipment on April 22, 1963. On January 1, 1964 it sublet the land and leased the equipment to its sister corporation, Fredeman's Calcasieu Locks Shipyard, Inc. The rental agreement described the property leased as a "certain tract of land and the equipment situated thereon or adjacent thereto." Rent was stipulated to be $1,000 per month (Exh. P–9A). Approximately fifteen days before the lease was executed, the Board of Directors of the two sister corporations (identical ownership) apportioned the monthly rental of $1,000 (P–9B and P–9C) as follows:

(1) $200 to land

(2) $800 to equipment

Defendant insists that the entire $1,000 should be attributed to land rent. PATCO argues that the allocation is proper and nothing additional is owed.

An examination of the original lease reveals that it covered only vacant land. Improvements were the property of the lessee. Consequently, the landowner's interest in the sublease could extend no further—the right to sublease covered only the property subject to the original lease. However, the plaintiff's sublease involved the defendant's land *and* the plaintiff's equipment. The $1,000 received under the five-year sublease was not attributable to the land alone but to the land and the equipment. The apportionment of land rent and equipment was proper, but if this is later declared to be error we make the following *alternate* conclusions:

(a) In fixing a rental price for the property the parties are in apparent agreement that an annual return of 8% of the land's market value is the proper rate of measure. Defendants paid $100,000 in 1966 and plaintiffs were willing to pay that amount in their unsuccessful state suit. We adopt that figure as the base value for the land for the 1964–69 sublease. That would set the proper rental figure at $8,000 per year, with a result that plaintiff owes defendant $2,800 per year as overplus, or a total of $14,000.

(b) Having entered into a sublease of the property with no designated apportionment of the relative land and equipment values, the plaintiff cannot now demand that this court make such an apportionment. Accordingly, the plaintiff owes its lessor the full amount specified in the original lease: one-half of the overplus of any sublease. The original rent was $2,400 per year. The sublease amounted to $12,000. One-half of the difference would be $4,800 per year, or $24,000 for the full five-year term of the sublease.

If PATCO's Sublease obligated it to pay an additional amount under the lease, which PATCO did not pay, we would be required to determine whether PATCO's failure to pay constituted sufficient cause for revocation. See La.Civ.Code Art. 2712. Under Louisiana law the rule is well established that the right to dissolve a lease is subject to judicial control according to the circumstances. Touchet v. Humble Oil and Refining Co., 191 F.Supp. 291 (W. D.La.1960); Edwards v. Standard Oil Company, 175 La. 720, 144 So. 430 (1930); Rudnick v. Union Producing Company, 209 La. 943, 25 So.2d 906 (1946); Farmers Gas Company v. La-Haye, 195 So.2d 329 (La.App.1967). Failure of a lessee to pay rent promptly does not automatically necessitate the termination of the lease. Rather, as this court made clear in Touchet:

Louisiana has never followed a dogmatic rule requiring the mechanical application of a general rule that a lessor may dissolve a lease for failure

on the part of lessee to pay rent promptly when due. On the contrary, in Louisiana the right to dissolve a lease is subject to judicial control according to the circumstances.

In view of the extensive controversy as to the obligations of plaintiff and defendant, the uncertainty as to the proper apportionment of land and equipment values under the sublease, plaintiff's apparent willingness to pay whatever rent was due when defendant accelerated the future rent, and defendant's refusal to accept all tenders of rent in any case, it would be unjust to cancel this lease without giving PATCO a reasonable opportunity to pay any rent that may be declared due. Surely, to quote from the Louisiana Supreme Court in Rudnick:

> * * * in this case there were grounds for honest doubt as to the rights of the parties.

## DENIAL OF LANDLORD'S TITLE

Finally, the defendant argues that even if plaintiff's lease was valid and binding when defendant took title to the property, the subsequent state court suit by PATCO constituted an attack by a lessee on a lessor's title, and the lease was thereby terminated. In support of his argument, defendant cites the 1874 case of Thayer v. Waples, 26 La.Ann. 502, a case which has heretofore remained uncited in any jurisprudence since the date of the decision. We hereby end this Shepardarian damnation of *Thayer* by accepting as a well established general principle that when a tenant denies the title of his landlord, the relation between them is severed.

In *Thayer*, plaintiff sued for wrongful eviction by his landlord, Mr. Waples. Although he had failed to pay his rent, he claimed that if it were due it was not payable to Waples, because Waples was not the owner of the property. Unfortunately for Thayer, the Court found that the rent *was* payable to Waples and held that "when a tenant denies the title of his landlord, the relation between them

is severed and the right of entry by the landlord is complete." Id. at 503, 504. By denying his landlord's interest in the leased property, lessee is saying in effect that the lease is a nullity; a party cannot lease property from someone who has no interest in it.

Here, the situation is quite different. By filing in the state court, PATCO sought only to exercise an option to purchase the leased property, a right granted in the lease itself, and this cannot be construed as a denial of the validity of the lease. Indeed, PATCO continued to make attempted rental payments during the duration of the state court suit. The evidence reveals that PATCO's actions constituted, if anything, an affirmation of the lease and not any repudiation of it. Of necessity, the option, if properly exercised, would have transferred title from defendant to plaintiff. More simply stated, PATCO said in the state court:

> You own this property; I have an option to purchase it on my recorded lease; I want the court to order you to recognize my rights and sell it to me.

## THE RIGHT-OF-WAY

Also at issue is the lease of a right-of-way recorded November 13, 1963, between Robert Ellis Moss and Fredeman's Calcasieu Locks Shipyard, Inc. This right-of-way crossed property adjacent to the shipyard and provided access to it. An original five year term was given commencing November 8, 1963, with options to renew for an additional nine terms. In a recorded deed made subject to this lease, Moss sold this adjacent property to Owens-Illinois. By letter dated September 26, 1968, Fredeman's Calcasieu Locks Shipyard, Inc., promptly gave notice that they intended to exercise the option for the first renewal term and tendered a rental check. Owens-Illinois rejected the attempted renewal of the lease and the tender of rent on the grounds that the shipyard lease was cancelled, and the

lease of the right-of-way therefore had "no further purpose." The lease to the 20 acres having been declared valid, it necessarily follows that the right-of-way does have a purpose. Defendant must honor it.

Judgment for plaintiff is attached.

## JUDGMENT

For written reasons this day assigned,

It is ordered, adjudged and decreed that there be judgment in favor of plaintiff (PATCO) and against defendant (Owens-Illinois), decreeing PATCO to be the owner of all rights emanating from the lease agreement of October 19, 1953, which is hereby declared to be valid and binding as of this date.

The counterclaim for rent is denied. Should it later be decided that as a result of the five (5) year lease to Fredeman's (January 2, 1964) PATCO owes an additional amount of rent to Owens-Illinois, then and in that case PATCO will be afforded a reasonable time to make such payment.